ROSE CARE, INC. *v.* Helen ROSS, Special Administratrix of the
Estate of Eula Givens, Deceased

CA 04-744 209 S.W.3d 393

Court of Appeals of Arkansas
Opinion delivered June 1, 2005

*Godwin Gruber LLP*, by: *L. Sean Mathis*; and *Williams & Anderson LLP*, by: *Jess Askew III, Kelly S. Terry* and *Debra L. Williams*, for appellant.

*Wilkes & McHugh, P.A.*, by: *Brian D. Reddick, Susan Nichols, Brian D. Brooks, Jack Patterson*, and *Tammera Harrelson*; and *Quattlebaum, Grooms, Tull & Burrow, PLLC*, by: *E.B. Chiles IV* and *Jennifer Wethington*, for appellee.

TERRY CRABTREE, Judge. Appellant Rose Care, Inc., a long-term care facility located in Saline County, appeals from a $1.6 million compensatory-damage verdict in favor of appellee Helen Ross, whose mother, Eula Givens, was a resident at Rose Care for a little more than one year. Ross has cross-appealed the trial court's refusal to submit the issue of punitive damages to the jury, along with certain evidentiary rulings. We affirm on direct appeal and reverse and remand on cross-appeal.

*Facts*

Eula Givens entered Rose Care on October 1, 1999, after having been a resident at another long-term care facility in Pine Bluff. She did not come to Rose Care a healthy woman but neither was she in a deteriorated condition. She was ninety years old, weighed 118 pounds, had no pressure sores (although she did have a red area on her coccyx), and suffered from diabetes, arthritis, hypertension, bladder incontinence, dementia, and a recent urinary-tract infection (UTI). The care plan prepared for her by Rose Care recognized that she would be dependent on the

facility's staff for virtually all of her activities for daily living, including her meals, which were to be spoon-fed to her. Among the problem areas noted in the care plan were her incontinence, her potential for skin breakdown, her recurrent UTIs, and her risk of dehydration and weight loss. The interventions recommended for these problems included checking her frequently for incontinence episodes, keeping her clean and dry, monitoring her skin daily, conducting weekly body audits, evaluating her nutritional needs, monitoring her food intake, and offering her fresh water often.

Beginning in late October 1999, Mrs. Givens's condition began to decline in several respects. On October 26, 1999, the red area on her coccyx had progressed to a Stage II pressure sore.[1] By late November and early December, she had Stage II sores on her hip, heel, and ankle. Her vital-signs record shows that, as of November 6, 1999, she weighed 102 pounds, having suffered a sixteen-pound weight loss in a little over one month. On November 7, 1999, she was hospitalized for five days with what hospital records describe as "severe dehydration and urinary tract infection." She was hospitalized again for several days beginning on November 19, 1999, with physician and hospital notes indicating that she was dehydrated and had a "probable" UTI with possible urosepsis.

On January 12, 2000, Mrs. Givens was again admitted to the hospital, this time with pneumonia, dehydration, and mild anemia. Although her weight had risen in mid-December to 105 pounds, by January, she was down to ninety-two pounds. Her weight loss persisted, and by May 2000, she weighed only seventy-six pounds. Additionally, her pressure sores increased in severity, with one sore intermittently progressing to a Stage III throughout January and two others progressing to Stage III by February 2000, where they remained through May 2000. At some point, one sore progressed to a Stage IV.

In July 2000, a feeding tube was inserted into Mrs. Givens, and she began to gain some of her weight back; by December 2000, she weighed 102 pounds. However, she continued to suffer

---

[1] As explained by one of appellee's experts, there are four stages of pressure sores or, as they are sometimes called, bedsores. In Stage I, there is an area of skin redness without a break in the skin. In Stage II, the top layer of skin is broken. In Stage III, the ulcer has progressed into the dermis layer of the skin, causing some pain. In Stage IV, the ulcer progresses to the muscle or bone, causing severe pain.

with UTIs and a Stage II pressure sore. On or about December 7, 2000, she had a UTI from which she did not recover and died approximately one week later.

On November 6, 2001, and by an amended complaint filed on June 7, 2002, appellee sued Rose Care in Saline County Circuit Court. She sought compensatory and punitive damages for medical malpractice, negligence, violation of the Arkansas Long Term Care Residents' Rights Law, Ark. Code Ann. § 20-10-1204 (Repl. 2000), and wrongful death. The factual basis of her claims was established at trial, where she contended that Rose Care understaffed its facility and allowed Mrs. Givens to become severely dehydrated, lose a great deal of weight, develop several painful pressure sores, suffer numerous indignities, and eventually die while a resident there. The following pertinent testimony was adduced on these matters.

Four former Rose Care employees who were Certified Nurse's Aides (CNAs) testified on behalf of appellee. They explained that, as CNAs, their duties consisted of helping residents with their daily activities such as feeding and bathing, providing them with water, and turning and repositioning them when they could not move themselves, which was required every two hours to avoid bedsores. Each of the CNAs testified that Rose Care was understaffed to the point that they could not carry out their duties in a timely fashion. For instance, Casie Davis said that she sometimes worked the facility's back hall — whose residents required total care — either all alone or with only one other CNA. Davis and another CNA, Minia Christian, testified that they complained about the understaffing to their superiors but received no helpful response. CNA Kristi Kindy testified that the task of providing water may have been neglected by CNAs due to understaffing. She recalled that Mrs. Givens wanted water "a lot" and that, when walking down the hall, she heard Mrs. Givens's voice quavering and asking for water. There was also testimony regarding the state of Mrs. Givens's hygiene. Davis recalled an incident where, at the start of her shift, she discovered Mrs. Givens with dried feces all over herself, her bed, and the wall. Davis said it took more than an hour to find someone to help her clean Mrs. Givens. Christian testified that, on three out of five mornings when she would begin working her shift, she would find Mrs. Givens saturated in urine, feces, or both. According to her, Mrs. Givens had feces under her fingernails and in her hair. The CNAs also related incidents in which a fresh bandage on Mrs. Givens had been placed over an

older bandage, a nurse unclogged Mrs. Givens's feeding tube by pouring Coca-Cola into it, Mrs. Givens's call light was placed out of her reach, and a maintenance man was "pulled onto the floor" to act as a CNA when state inspectors came to the facility.

Rose Care's nursing consultant, Nancy Alread, was also called by appellee. Through her, appellee established that state and federal regulations require that: 1) a resident without pressure sores should not develop pressure sores unless her clinical condition indicates that the sores were unavoidable; 2) the facility must provide each resident with sufficient fluid intake to maintain proper hydration and health; 3) based on a resident's comprehensive assessment, the facility must ensure that a resident maintains acceptable parameters in nutritional status such as body weight and protein levels unless the resident's clinical condition demonstrates that this is not possible; 4) resident records and charts are to be complete and accurately documented; 5) the facility must have sufficient nursing staff to provide for the residents' needs. Alread's testimony revealed violations of those regulations by Rose Care in its stewardship of Mrs. Givens. For instance, although she testified as to the importance that a resident's consumption and intake/output (I/O) records be accurate if the resident is at risk of weight loss or dehydration, she admitted that there were errors in Mrs. Givens's records. Her charts did not document her I/O figures on several days prior to her first hospitalization and some of her I/O figures that *were* documented were on days that she was hospitalized and not present at the facility. Further, her charts did not document that she had been receiving a nutritional supplement that had been ordered for her. Alread also acknowledged that certain records reflected that Mrs. Givens consumed meals at the facility on days that she was hospitalized.

Alread further said that regulations call for a resident's care plan to be reassessed quarterly but sooner if significant changes occur. She agreed that Mrs. Givens's weight loss and hospitalizations for dehydration were significant and should probably have triggered changes in her care plan; however, she said, the care plan did not mention these events or set out new interventions to address them. Alread said finally that pressure sores and hydration and nutrition problems could indicate understaffing.

Appellee's other pertinent witnesses were her experts, Nurse Olive Brown and Dr. William Patrick Joseph. Because the testimony of these witnesses is particularly pertinent to the first two issues on appeal, *i.e.*, whether there was sufficient evidence to

support the medical-malpractice and wrongful-death verdicts, we will provide a synopsis of their testimony in conjunction with our discussion of those issues. For now, it is enough to say that Nurse Brown offered her opinion that Rose Care breached the standard of care applicable to nursing homes in several respects and that Dr. Joseph testified that Mrs. Givens's death was caused by the final UTI that she suffered in December 2000.

Rose Care, for its case, presented the testimony of its administrator Melba Hutcheson; its activities director, Joyce Staggs; one of its nurses, Kathy Barnhill; its medical director, Dr. David Stewart; and two expert witnesses, Nurse Lori Reasoner and Dr. Randy Hill. Hutcheson, Staggs, and Barnhill all said that Rose Care was well staffed and well supplied, and they denied the allegations made by the CNAs who testified on appellee's behalf. Each of them also testified that Mrs. Givens's problems could be explained by the fact that she often refused to eat and would keep her mouth closed or spit out her food. Dr. Stewart testified that he spoke with Mrs. Givens's family in January 2000 regarding inserting a feeding tube but that they did not want to pursue that, a claim that appellee denies. He said that the family later changed their mind and had a feeding tube inserted in July 2000, whereupon Mrs. Givens began to improve. At the time of Mrs. Givens's last infection, according to Dr. Stewart, appellee "didn't want anything done," although he admitted that he did not talk to appellee about hospitalizing Mrs. Givens because "I didn't think I could do much more in the hospital than I was doing [at Rose Care]."

Lori Reasoner, who was a nurse practitioner at another long-term care facility, testified that Rose Care was not understaffed; that Mrs. Givens was in decline before she entered Rose Care; that her pressure sores were unavoidable; that Rose Care did nothing that caused Mrs. Givens to become dehydrated; and that Rose Care tried to prevent her weight loss by administering supplements and vitamins. She admitted that there were errors in Mrs. Givens's charts regarding documentation of meal consumption and I/O numbers. However, she opined that Rose Care responded appropriately when Mrs. Givens's condition changed significantly with regard to weight loss, dehydration, and pressure sores and that it was not necessary to revise her care plan so long as the problems were being addressed. On cross-examination, Reasoner admitted that the presence of a resident riddled with pressure sores, suffering repeated bouts of dehydration, severe weight loss, and poor hygiene, with feces in her hair and under her fingernails,

would prompt her to investigate. She also said that Rose Care's Director of Nursing's name appeared on staff sign-in sheets several times, possibly so the facility would have enough staff.

Dr. Randy Hill offered his expert opinion that Rose Care did not cause Mrs. Givens's death, although he did agree that she died of a UTI. He said that her decline was consistent with dementia patients; that nothing Rose Care did or did not do caused her to have UTIs; and that Rose Care's staff communicated well with Dr. Stewart at the time of the last UTI. He said on cross-examination, however, that Mrs. Givens's debilitated state contributed to her death.

Following the presentation of the above testimony, the jury was instructed on claims for ordinary negligence, medical malpractice, violation of the residents' rights statute, and wrongful death, and they were provided with a separate verdict interrogatory for each cause of action. In order to prevent their attributing damages for the same injury to more than one cause of action, they were told on each interrogatory that:

> any element of damage considered by you in answering this interrogatory should not also be considered by you in answering any other interrogatory. In other words if you award damages for injuries sustained by Ms. Givens as a result of [a particular cause of action], you must not award damages for those same injuries as a result of [the other three causes of action].

After deliberations, the jury returned verdicts against Rose Care on each count, awarding $1,000,000 for negligence, $250,000 for medical malpractice, $100,000 for violation of a resident's rights, and $250,000 for wrongful death. Rose Care's first argument on appeal is that the evidence was insufficient to support the jury's verdict for medical malpractice.

### Sufficiency of the Evidence — Medical Malpractice

Rose Care moved for a directed verdict on the medical-malpractice claim, arguing that appellee's experts did not establish a link between Rose Care's conduct and Mrs. Givens's injuries. The trial court denied the motion, which Rose Care assigns as a point of error.

■■ A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Curry v. Thornsberry*, 354 Ark. 631, 128 S.W.3d 438 (2003).

Substantial evidence is defined as that which is of sufficient force and character that it will compel a conclusion one way or another. It must force or induce the mind to pass beyond suspicion or conjecture. *John Cheeseman Trucking, Inc. v. Dougan*, 313 Ark. 229, 853 S.W.2d 278 (1993). In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Curry v. Thornsberry, supra.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented. *Id.* It is not our province to try issues of fact; we simply examine the record to determine if there is substantial evidence to support the jury verdict. *Id.*

■ Our medical-malpractice statutes set forth the burden of proof that must be met by a plaintiff.[2] In any action for medical injury, when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, the plaintiff shall have the burden of proving: (1) by means of expert testimony provided only by a medical-care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical-care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality; (2) by means of expert testimony provided only by a medical care provider of the same specialty as the defendant that the medical-care provider failed to act in accordance with that standard; (3) by means of expert testimony provided only by a qualified medical expert that, as a proximate result thereof, the injured person suffered injuries that would not otherwise have occurred. Ark. Code Ann. § 16-114-206(a) (Supp. 2003). Further, the expert's opinion must be stated within a reasonable degree of medical certainty or probability. *See Watts v. St. Edward Mercy Med.*

---

[2] Nursing homes are included in the statutory definition of a "medical care provider" for purposes of medical-malpractice actions. *See* Ark. Code Ann. § 16-114-201(2) (1987). Further, the term "medical injury" for which recovery may be had under the malpractice statutes includes "any adverse consequences arising out of or sustained in the course of the professional services being rendered by the medical care provider, whether resulting from negligence, error, or omission in the performance of such services." Ark. Code Ann. § 16-114-201(3) (1987).

*Ctr.*, 74 Ark. App. 406, 49 S.W.3d 149 (2001). Rose Care does not argue that appellee's proof was deficient for lack of expert qualifications, lack of testimony of a breach of the applicable standards of care, or failure to state opinions within a reasonable degree of medical certainty. Its argument on appeal is confined — as it was below — to the third statutory element, *i.e.*, that expert testimony as to proximate cause was wanting in this case.

We look to the testimony of appellee's expert witness on nursing-home care, registered nurse Olive Brown. Nurse Brown had worked as a CNA, a licensed practical nurse, (LPN) and a registered nurse (RN). At the time of trial, she was the Director of Nursing for a 175-bed facility in New York. She possessed a master's degree in nursing and hospital health-service management and was a doctoral candidate in health-service administration. She also expressed familiarity with nursing-home regulations at both the state and federal levels and with the standard of care for nursing homes in Arkansas. She had previously testified as an expert in Arkansas and other states.

Brown testified that Rose Care failed to meet the standard of care for nursing homes in five particular areas: 1) the monitoring of Mrs. Givens's weight; 2) the monitoring of Mrs. Givens's hydration status; 3) the management and prevention of pressure ulcers; 4) the provision of an appropriate care plan; 5) the use of restraints. In the interest of conserving both the reader's resources and our own, we will not recite the sum and substance of Nurse Brown's opinions as to each of the above areas; her learned testimony was quite extensive. Instead, we limit our discussion to two aspects of her opinions that clearly establish a causal link between Rose Care's actions and Mrs. Givens's injuries — Rose Care's failure to monitor Mrs. Givens's weight loss and its failure to manage and prevent her pressure sores.

With regard to Mrs. Givens's weight loss, Brown opined that Rose Care failed to evaluate why Mrs. Givens was not eating. She also said that, after Mrs. Givens suffered a sixteen-pound weight loss in November 1999, Rose Care failed to reevaluate her condition and establish new interventions. Had proper evaluations taken place, Brown said, "I'm sure that a cause for weight loss would have been determined and, therefore, you could move on before it got to 36 pounds." In other words, Rose Care's failure to act quickly to ascertain the cause of Mrs. Givens's weight loss and establish new interventions resulted in her continuing to lose weight in drastic amounts. Regarding Rose Care's management of

the pressure sores, Brown stated that Mrs. Givens's Stage II pressure sores "could have been healed" and that it was a breach in the standard of care that they were allowed to progress to Stages III and IV. Further, she said, Stage IV sores were very painful. She also said that the nursing-home staff should have known what could happen if they did not turn and reposition the residents frequently enough. Moreover, she said, Rose Care's nurses should have known that they "absolutely must be aggressive with those pressure sores" to keep them from worsening but that they were not doing so. Further, in testimony that shows the synergystic nature of Mrs. Givens's many ailments, Brown stated that pressure sores are prevented by maintaining hydration and weight.

Although Nurse Brown did not make the exact statement in her testimony that Rose Care's lack of care "proximately caused" Mrs. Givens's injuries, Arkansas does not require any specific "magic words" with respect to expert opinions, and they are to be judged upon the entirety of the opinion, not validated or invalidated on the presence or lack of "magic words." *Wal-Mart Stores, Inc. v. Kilgore*, 85 Ark. App. 231, 148 S.W.3d 754 (2004). Even in medical-malpractice cases proximate cause may be shown from circumstantial evidence, and such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the conclusion may be fairly inferred. *Id.* Brown's opinions, in their entirety, contain substantial evidence from which the jury could have fairly inferred a causal link between Rose Care's conduct and Mrs. Givens's injuries. We therefore affirm the medical-malpractice verdict.[3]

### Sufficiency of the Evidence — Wrongful Death

Rose Care moved for a directed verdict on the wrongful-death claim, arguing as follows:

---

[3] Rose Care argues that appellee should be barred from arguing that its conduct with respect to dehydration, weight loss, and pressure sores constituted medical malpractice because she contended at trial that those elements constituted ordinary negligence or a violation of a residents' rights. Rose Care is referring to colloquies between appellee's counsel and the court during a discussion of the statute of limitations. Any statement made by appellee's counsel concerning the causes of action to which those elements pertained was not directed to the jury but to the court in a bench conference. The jury was not instructed that any particular element of damage corresponded to any particular cause of action.

> We heard testimony from their doctor, Dr. Joseph, that Ms. Givens died of a treatable and curable urinary tract infection that developed in December 6 [sic], 2000. He had no testimony giving a causal link between any acts or omissions . . . in the development of that urinary tract infection to the nursing home. Their nursing expert, Nurse Brown, offered no causal link between the development of the urinary tract infection and anything the staff at Rose Care either did or failed to do. So under [Ark. Code Ann. § 16-114-206(a)(3)] they've got the burden of proving with expert testimony from a qualified medical expert that the alleged injuries were proximately caused by the negligence of the defendant and I don't think they've done it in this case.

The trial court denied the motion. Our standard of review is the same as that recited in the discussion of the previous issue. Further, because a medical injury resulting in the death of a person is governed by our medical-malpractice statutes, *see Pastchol v. St. Paul Fire & Marine Insurance Co.*, 326 Ark. 140, 929 S.W.2d 713 (1996), the statutory burdens of proof set out in Ark. Code Ann. § 16-114-206(a) apply.

Again we note that Rose Care appeals solely on the question of proximate cause. There is no contention that Dr. Joseph lacked qualifications, failed to establish that Rose Care breached the applicable standards of care, or failed to state his opinions within a reasonable degree of medical certainty.

Our resolution of this point requires a close reading of Dr. Joseph's testimony. He began by offering his opinion that Mrs. Givens died of a urinary-tract infection. He agreed that she was susceptible to UTIs but said that neither her susceptibility nor the fact that she was ninety-one years old necessarily meant that she would die from a UTI. He further said that, if an individual is prone to such infections, dehydration increases that risk. When asked why she died of the UTI, Dr. Joseph testified as follows:

> DR. JOSEPH: Mrs. Givens died from a urinary tract infection that became so severe that it caused her death. That is not something that is expected in anyone unless there are additional risk factors for an infection to become severe. Recognized risk factors for [a] urinary tract infection to become severe are usually malnutrition and dehydration.

> COUNSEL: Can malnutrition and dehydration cause debilitation in a resident that has urinary tract infections . . . . Can malnutrition and dehydration be factors in debilitating a person?
>
> DR. JOSEPH: I believe you used the term debilitation, and that's a generic or general term. And, yes, it can. Dehydration and malnutrition can be factors that cause debilitation. Debilitation is a common term that generally means a weakened system. I was much more specific in saying that a urinary tract infection in a person who is dehydrated and malnourished is much more likely to be a severe and life-threatening urinary tract infection.

On cross-examination, Dr. Joseph testified that, if Mrs. Givens had been transferred to an acute-care hospital, the infection could have been treated. He also gave his opinion that Mrs. Givens's prior urinary-tract infections for which she was hospitalized between November 1999 and January 2000 did not cause her death. When asked specifically whether Mrs. Givens's weight loss or malnutrition caused her death, he said:

> Well, you've linked a couple of things together . . . in assuming that weight loss is the only risk factor from malnutrition. The weight loss that I saw in Ms. Givens was predominantly during the first half of the year 2000. The weight loss that occurred in the first part of the year 2000 I don't think had a contributing factor to her death but that does not mean that there wasn't malnutrition that occurred concomitantly with her infection in December. Malnutrition can certainly occur without weight loss.

He clarified that he was not testifying that Ms. Givens was malnourished in December 2000 because the records were not complete enough to reach that conclusion.

Although Dr. Joseph testified on direct examination that dehydration and malnutrition were risk factors in creating a severe UTI, he offered no testimony that Mrs. Givens was either dehydrated or malnourished at the time of her death. Additionally, he said that Mrs. Givens's most severe UTIs, which caused her to be hospitalized, did not contribute to her death. However, our attention is drawn to Dr. Joseph's comments regarding the effects of a person's debilitation on the development of and the ability to withstand a severe UTI and his testimony that some risk factor

must be present for a UTI to become deadly. This testimony is most telling when read in connection with the statement of Rose Care's expert, Dr. Randy Hill, who said that Mrs. Givens's debilitated state contributed to her death. The jury had before it evidence of Mrs. Givens's long, slow decline precipitated and propelled by incidents of substandard care and neglect such as those mentioned by the CNAs who testified on appellee's behalf — a decline whose effects were unquestionably debilitating and which, the jury could fairly infer, ultimately rendered Mrs. Givens too devitalized to overcome a urinary-tract infection.

■■ Causation is ordinarily a question of fact for the jury to decide. *Stecker v. First Commercial Trust Co.*, 331 Ark. 452, 962 S.W.2d 792 (1998). Moreover, as stated earlier, even in medical-malpractice cases proximate cause may be shown from circumstantial evidence, and such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the conclusion may be fairly inferred. *Wal-Mart Stores, Inc. v. Kilgore, supra.* The expert testimony in this case with regard to proximate cause is sufficient to support the jury's verdict for wrongful death.

### Evidentiary Errors

Rose Care asserts that the trial court made three errors in evidentiary rulings that merit reversal. The first came about as the result of a colloquy that occurred during appellee's voir dire of potential jury members. Appellee's counsel asked the venire whether they thought that punitive damages worked to deter future conduct by companies. Venireman James responded:

> I would have some questions about whether they worked [in] the medical profession because to me it seems like most of the money is coming from insurance companies and the damages would just be passed along. Drive up the cost of health care for everyone.

James further said that, while punitive damages might be useful in a sexual-harassment situation, "in health care where people are not actually paying for the — where the insurance companies are paying . . ." At that point, James was cut off by appellee's counsel and asked "you haven't heard testimony to that effect though, have you?" James said, "No, I just, I'm saying that those people who have medical care or insurance, you know, I mean . . ." James was cut off again, and counsel asked:

> Assuming that you don't ever hear any evidence, assume that you're picked to sit on this jury and you never hear any evidence that — I mean that there's any insurance in this case or that anyone's going to actually — in other words, you don't get any information as to who actually pays the verdict, are you able to set aside that preconceived notion that someone other than the nursing home or someone other than the company is going to pay for the damages? And sit here and rule fair and impartially on the facts and evidence that you hear in this case?

James said that he thought he could. Counsel then reiterated that he was trying to find out whether James had any preconceived notion about the futility or uselessness of punitive damages.

█ At this point, Rose Care moved to strike the venire on the grounds that appellee's counsel had "interjected insurance" into the case. The trial court denied the motion, and Rose Care contends on appeal that this was error. Our standard of review is whether the trial court abused its discretion in refusing to strike the jury panel. *See generally Goins v. State,* 318 Ark. 689, 890 S.W.2d 602 (1995).

█ As a general rule, it is improper for either party to introduce or elicit evidence of the other party's insurance coverage. *Synergy Gas Corp. v. Lindsey,* 311 Ark. 265, 843 S.W.2d 825 (1992). Certainly, where there has been an intentional and deliberate reference to insurance when it was not an issue in the case and when the opposing party had not opened the door for its admission, a mistrial is the proper remedy. *See id.; Hacker v. Hall,* 296 Ark. 571, 759 S.W.2d 32 (1988); *Vermillion v. Peterson,* 275 Ark. 367, 630 S.W.2d 30 (1982). However, where the attorney poses a question with apparent sincerity and in good faith rather than in a deliberate attempt to prejudice the jury, and the witness answers with a reference to insurance, an admonition by the court is ordinarily sufficient to correct the error. *Id.*

█ It appears from the transcript of the exchange between Venireman James and appellee's counsel that counsel was asking in good faith about punitive damages, that he did nothing to elicit the mention of insurance, and that he in fact tried to steer James away from the topic. Further, Rose Care did not ask for an admonition of any kind. Under these circumstances, we cannot say that the trial court abused its discretion in refusing to strike the panel. *See also King v. Westlake,* 264 Ark. 555, 572 S.W.2d 841

(1978), and *Hill v. Billups*, 85 Ark. App. 166, 148 S.W.3d 288 (2004), where counsel was permitted to pose questions to the venire as to whether they believed that insurance premiums would increase if they rendered a verdict for the plaintiff.

The second evidentiary point of error concerns Rose Care's motion in limine that sought, in part, to exclude testimony by appellee's experts regarding issues not disclosed during the experts' depositions. The court ruled, "let's try to avoid that happening." During Nurse Brown's testimony, she testified about what appropriate staffing levels would be required under federal regulations. Rose Care objected that Brown was offering an opinion that she had not offered during her deposition, but the trial judge allowed the testimony. During Dr. Joseph's testimony, he stated, over Rose Care's same objection, that malnutrition and dehydration could debilitate a person and that poor catheter care could lead to UTIs. Rose Care argues on appeal that the evidence should not have been admitted because the expert's opinions were not provided in discovery and that, under Ark. R. Civ. P. 26(e)(1)(B) (2004), a party is under a duty to supplement its discovery responses with the substance and subject matter upon which the party expects its experts to testify.

A trial court's decision to admit evidence is within its discretion and will not be reversed absent an abuse of discretion. *See Aka v. Jefferson Hosp. Ass'n*, 344 Ark. 627, 42 S.W.3d 508 (2001). Further, when a party complains about failure to update discovery, the matter lies within the discretion of the trial court. *Hill v. Billups, supra.*

Rose Care relies on *Arkansas State Highway Commission v. Frisby*, 329 Ark. 506, 951 S.W.2d 305 (1997), an eminent-domain case. There, our supreme court reversed on the basis of a discovery violation when the landowners' expert testified in his deposition that the pre-taking value of the land was either $113,000 or $117,000 but testified at trial, based on new facts and figures not previously provided, that its value was $158,000. In the case at bar, unlike *Frisby*, we are unable to tell exactly what opinions these experts offered in their depositions because those depositions are not contained in the record. Thus, we have no way of confirming that their trial testimony in fact exceeded the scope of the opinions that they offered in their depositions. It is an appellant's burden to bring up a record sufficient to demonstrate error, and matters outside the record will not be considered in

making a ruling on appeal. *See Estates of Seay v. Quinn*, 352 Ark. 113, 98 S.W.3d 821 (2003). Because Rose Care has not met that burden, we affirm on this point.

The final evidentiary error asserted by Rose Care concerns the admission of a 1999 Office of Long Term Care (OLTC) survey into evidence. The survey cited Rose Care for a violation where a resident who was at risk for pressure sores was observed in the same position on September 29, 1999, from 9:20 a.m. until 12:16 p.m. Rose Care argues that the survey was irrelevant and unfairly prejudicial because it was conducted before Mrs. Givens became a resident and it involved issues relating to residents other than Mrs. Givens. Our standard of review remains the abuse-of-discretion standard. *Aka v. Jefferson Hosp. Ass'n, supra.*

In *Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003), *cert. denied*, 540 U.S. 1004 (2003), a case similar to the case at bar, 1997 and 1998 OLTC surveys containing information about the care of residents other than Mrs. Sauer were admitted into evidence (although Mrs. Sauer was a resident of the facility during those periods). The supreme court held that the surveys were relevant because they reflected problems with staffing and lack of quality care that, according to the court, tended to show that the Sauer estate's allegations that those problems existed in regard to Mrs. Sauer were more or less probable. Further, the court said, the surveys were relevant to show that the facility was on notice of dangerous conditions due to understaffing. Likewise, in the present case, the 1999 survey, which was completed just as Mrs. Givens was admitted to Rose Care, showed evidence of a problem with failure to turn and reposition residents in a timely fashion, one of the exact allegations that appellee made against Rose Care in this case. It also showed that, at the time of Mrs. Givens's admission, Rose Care was on notice that it had a problem in complying with turning and repositioning requirements. In light of the ruling in *Advocat, supra*, we find no abuse of discretion with regard to the admission of the 1999 survey.

### Denial of Motion of New Trial

Rose Care makes two arguments on appeal that were made below solely in its motion for a new trial — that the jury's damage awards were excessive and that juror misconduct occurred when two jurors mentioned their personal experiences with nursing homes during deliberations. We do not reach the merits of these

arguments because Rose Care's notice of appeal does not reflect that an appeal has been taken from the denial of the motion for a new trial.

Following the entry of judgment on the jury's verdict, Rose Care filed timely post-trial motions for a new trial and for a judgment notwithstanding the verdict. The motions were deemed denied when they were not ruled upon within thirty days of their filing. *See* Ark. R. Civ. P. 59(b) and 50(b)(2) (2004). Rose Care's notice of appeal, which was filed on April 12, 2004, recites that it is appealing from the "final judgment" entered on February 11, 2004, referring to the judgment entered on the jury's verdict. However, the notice of appeal does not mention that an appeal was being taken from the "deemed denial" of the new trial motion.

A notice of appeal must state the order appealed from with specificity, and orders not mentioned in the notice of appeal are not properly before the appellate court. *See Arkansas Dep't of Human Servs. v. Shipman,* 25 Ark. App. 247, 756 S.W.2d 930 (1988). More recently, our supreme court stated the same in a criminal case. *See Wright v. State,* 359 Ark. 418, 198 S.W.3d 537 (2004). Further, in *Tate-Smith v. Cupples,* 355 Ark. 230, 134 S.W.3d 535 (2003), the supreme court noted that, when a motion for a new trial has been deemed denied, the only appealable matter is the original order; however, any previously filed notice of appeal may be amended to appeal from the deemed-denied motion. *See also United States Bank v. Milburn,* 352 Ark. 144, 100 S.W.3d 674 (2003) (indicating that a notice of appeal should be filed in order to appeal from the denial of a post-trial motion for reconsideration).

Because Rose Care's notice of appeal does not mention the deemed denial of the new-trial motion or that an appeal is being taken from any order other than the original judgment, we do not reach the issues that were solely raised in the new-trial motion.

## Cross-Appeal: Directed Verdict on Punitive Damages

The trial court granted Rose Care's motion for a directed verdict on appellee's punitive-damages claim, which appellee claims is reversible error. In reviewing an order granting a motion for directed verdict, the appellate court views the evidence in the light most favorable to the party against whom the

verdict was directed; if *any* substantial evidence exists that tends to establish an issue in favor of that party, then a jury question is presented, and the directed verdict should be reversed. *Trotter v. Bowden,* 81 Ark. App. 259, 101 S.W.3d 264 (2003).

■ The critical inquiry with respect to punitive damages is to determine whether there is evidence that a party likely knew, or ought to have known, in light of the surrounding circumstances, that his conduct would naturally or probably result in injury and that he continued such conduct in reckless disregard of the consequences from which malice could be inferred. *Union Pac. R.R. Co. v. Barber,* 356 Ark. 268, 149 S.W.3d 325 (2004).[4]

■ There was evidence in this case that Rose Care was chronically understaffed and had ignored CNA complaints on the matter; that rewards were offered for facilities that kept within budget constraints; that Rose Care would "pull" a maintenance man onto the floor as staff during inspections; that Mrs. Givens lost a troubling amount of weight in a short time and that her charts did not properly reflect her feeding schedule; that Mrs. Givens was dehydrated three times within a few months and that her fluid-intake/output chart contained readings for days that she was not on the premises; that Mrs. Givens's pressure sores increased in severity alarmingly over several months even though, according to one expert, they should clearly have been cured at the less severe stages; that Rose Care had been cited for failure to turn and reposition residents every two hours as required; that Mrs. Givens was found on several occasions covered in dried feces, which indicates an appalling level of neglect; and that all of these conditions occurred despite the fact that, in its initial care plan, Rose Care established that Mrs. Givens was at risk for many of these very conditions. These factors constitute "any substantial evidence" of reckless disregard, such that a directed verdict on punitive damages was improper. We therefore reverse and remand for a new trial on the issue of punitive damages.[5]

---

[4] Neither party mentions the Civil Justice Reform Act of 2003, which has several provisions pertaining to punitive damages. *See* Ark. Code Ann. § 16-55-201 to -220 (Supp. 2003). We make no ruling on whether the Act is applicable in the present case.

[5] We have found no Arkansas case that addresses the subject of whether a new trial may be ordered on the issue of punitive damages alone, and neither party cites one. Our research

*Remaining Issues on Cross-Appeal*

In discovery, appellee requested production of reports, correspondence, or other writings generated by or on behalf of any management or consultant to Rose Care concerning the care and treatment of residents between October 1, 1999, and December 14, 2000. At a hearing on a motion to compel, the trial court refused to order discovery of the reports on the grounds that they involved remedial measures. Appellee appeals from this ruling.

 Trial courts have wide discretion in all matters pertaining to discovery, and we will not reverse their decisions absent an abuse of discretion that is prejudicial to the appellant. *Heinrich v. Harp's Food Stores, Inc.*, 52 Ark. App. 165, 915 S.W.2d 734 (1996). However, the trial court's ruling in this instance appears to have been based on the reports' supposed inadmissibility into evidence and not on their discoverability. It is not grounds for objection to a discovery request that the information sought will not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Ark. R. Civ. P. 26(b)(1) (2004). As previously noted in the *Advocat* case, the conditions and care of other residents in a long-term-care facility may be relevant to show that a plaintiff's allegations regarding the same matters are more or less probable.

 Rose Care argues that appellee never established that such consultant reports existed. However, that is one of the purposes of discovery; it is impossible to determine whether such reports exist and what information they contain until they are produced, or until Rose Care states that there are no such reports or offers a legitimate basis for them not to be discovered. We therefore reverse on this point.

Appellee also argues that the trial court erred in denying admission of a 1998 OLTC survey, even though the court had admitted a 1999 OLTC survey. In the 1998 survey, Rose Care was cited for, *inter alia*, deficiencies for improper use of restraints, improper grooming of residents (including two instances where a resident was found with a brown substance under her fingernails),

did reveal cases from other jurisdictions that have ordered a retrial solely on punitive damages. *Jannotta v. Subway Sandwich Shops*, 125 F.3d 503 (7th Cir. 1997); *McClure v. Walgreen Co.*, 613 N.W.2d 225 (Iowa 2000); *Gulf Guar. Life Ins. Co. v. Duett*, 671 So.2d 1305 (Miss. 1996); *Fabricor, Inc. v. E. I. DuPont*, 24 S.W.3d 82 (Mo. App. 2000).

failure to prevent UTIs, improper treatment of pressure sores, and at least four instances where a resident at risk for pressure sores remained in the same position for more than two hours – all issues that were present in this case. However, the trial court determined that the 1998 survey was "too remote" in time to be relevant.

■■ We believe that the court abused its discretion in the evidentiary ruling. Rose Care argues that admission of the survey would violate the U.S. Supreme Court's holding in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), a seminal punitive-damages decision, which ruled that a defendant should not be punished for being an unsavory business but only for conduct that harmed the plaintiff. According to Rose Care, the 1998 survey would permit a jury to award damages against it to punish its conduct toward persons other than Mrs. Givens. However, Rose Care agrees that evidence of prior conduct affecting nonparties satisfies due process so long as it is substantially similar to the conduct that harmed the plaintiff. In fact, the admissibility of prior similar occurrences is commonly accepted in Arkansas upon a showing of sufficient similarity in circumstances, see *Union Pacific R.R. Co. v. Barber, supra*, although exact identity of circumstances is not required for admissibility. *Arrow Int'l v. Sparks*, 81 Ark. App. 42, 98 S.W.3d 48 (2003). Rose Care claims that the 1998 survey contains evidence of violations that are not substantially similar to its conduct toward Mrs. Givens. While we agree that some of the conduct mentioned in the survey is not substantially similar to that which occurred in this case, the survey contains numerous incidents that *are* substantially similar and relevant to appellee's claim for punitive damages. *See Arrow Int'l, supra*. We therefore conclude that, with proper redacting upon remand, the survey can be suited for admissibility.

In light of the foregoing, we affirm the jury's verdict on direct appeal and reverse and remand on cross-appeal.

NEAL and ROAF, JJ., agree.