Wanda SCOTT, Administratrix of the Estate of Ethel Mince,
Deceased *v.* CENTRAL ARKANSAS NURSING
CENTERS, INC., Nursing Consultants, Inc.,
and Michael Morton

CA 06-1252                                    278 S.W.3d 587

Court of Appeals of Arkansas
Opinion delivered March 5, 2008

*Wilkes & McHugh, P.A.*, by: *Susan Nichols Estes, Melody H. Piazza* and *Deborah Truby Riordan*; and *Brian G. Brooks Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Lyn P. Pruitt* and *Jeffrey W. Hatfield*, for appellees Robinson Nursing and Rehabilitation Center, LLC, Central Arkansas Nursing Centers, Inc., Nursing Consultants, Inc.

*Hardin, Jesson & Terry, PLC,* by: *Kirkman T. Dougherty,* for appellee Michael S. Morton.

W ENDELL L. GRIFFEN, Judge. This appeal is brought from the grant of appellees' motions for a directed verdict and the denial of appellant's motion for a new trial. We affirm in part and reverse and remand in part.

## I. Factual and Procedural Background

Appellant is the daughter of the late Ethel Mince, who died on September 18, 2002, while residing at Robinson Nursing & Rehabilitation Center. Appellee Central Arkansas Nursing Centers, Inc. (CANC), provided administrative services to Robinson under a written agreement, for which it received three and one-half percent of Robinson's gross revenues. Appellee Nursing Consultants, Inc. (NCI), provided consulting services to Robinson and other long-term-care facilities in exchange for a fee paid by the facilities. Appellee Michael Morton was the sole shareholder of CANC and NCI and a fifty-percent shareholder in Robinson. He acquired his interest in Robinson in late 2001.

In May 2001, Ethel Mince entered Robinson Nursing & Rehabilitation Center. She had a history of heart disease, dementia, and other illnesses, but she was able to walk, feed herself, and attend to her bathroom needs. Her condition remained fairly sound through February 2002, when she developed shaking, chills, cough, and a high fever. A nurse practitioner prescribed an antibiotic, but, by February 16, Mrs. Mince was lethargic and unresponsive. She was transported to the hospital and arrived in critical condition with bilateral pneumonia.

Mrs. Mince recovered enough to return to Robinson on February 25, 2002. Her prognosis was poor, and hospice care was recommended. Nevertheless, she improved somewhat and gained a few pounds, although she could no longer feed herself. But, within several weeks, she began losing weight and developing pressure sores. Thereafter, she steadily deteriorated — her sores got worse, her food intake decreased, and she became incontinent. She died on September 18, 2002. According to Coroner Mark Malcom, Mrs. Mince was in an emaciated condition at her death, which indicated a lack of proper nutrition. Malcom also observed multiple decubitus ulcers (pressure sores) that were decayed and emitting a foul odor. Two of the sores were so severe that the bone was exposed. The death certificate listed congestive heart failure as

the immediate cause of death and listed pressure sores and inanition (wasting away due to lack of food and water) as significant conditions contributing to death.

On August 15, 2003, and by an amended complaint dated May 23, 2005, appellant sued Robinson and appellees for wrongful death, negligence, breach of contract, and violation of the Arkansas Long Term Care Residents' Rights statute, Ark. Code Ann. § 20-10-1204 (Repl. 2005). She alleged that inadequate staffing and various acts of malfeasance, including improper hygiene, skin care, and nutritional care, proximately caused Mrs. Mince's injuries and death. The case went to trial in early 2006 against all four defendants. At the close of appellant's case, the trial court directed verdicts in favor of appellees on the ground that appellant's evidence against them was so insubstantial that it failed to move beyond speculation and conjecture. The trial proceeded against Robinson, and the jury returned a verdict in Robinson's favor. Appellant then moved for a new trial on the ground that, during voir dire, a prospective juror failed to disclose "potentially relevant and disqualifying information." The trial court did not rule on the new-trial motion, and it was deemed denied on the thirtieth day after it was filed. Ark. R. Civ. P. 59(b). Appellant filed a timely notice of appeal, and she now argues that: 1) the trial court erred in directing verdicts in favor of appellees; and 2) the trial court abused its discretion in denying her motion for a new trial.

## II. Directed Verdicts

We first address appellant's argument that the trial court erred in granting directed verdicts in favor of appellees. Appellant contends that she presented substantial evidence from which a jury could find all three appellees liable for negligence or wrongful death.[1] Appellant does not challenge the sufficiency of the evidence to support the jury verdict in favor of Robinson.

---

[1] Appellant does not argue that the directed verdicts were incorrect as to her claims for breach of contract and violation of residents' rights. It appears undisputed that appellees had no contract with Mrs. Mince. Further, a violation-of-residents'-rights count may be enforced only against a licensee, which in this case was Robinson. Ark. Code Ann. § 20-10-1209(a)(1) (Repl. 2005); *Health Fac. Mgmt. Group v. Hughes*, 365 Ark. 237, 227 S.W.3d 910 (2006).

## A. Standard of Review

In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Curry v. Thornsberry*, 354 Ark. 631, 128 S.W.3d 438 (2003). A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Id.* Stated another way, a motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.* Substantial evidence is evidence of sufficient force and character to induce the mind of the fact finder past speculation and conjecture. *Sparks Reg'l Med. Ctr. v. Smith*, 63 Ark. App. 131, 976 S.W.2d 396 (1998).

## B. Trial Testimony

The following summary of pertinent evidence is taken from appellant's abstract and is recounted in the light most favorable to appellant.

Appellant Wanda Scott and her sister, Marilyn Borecky, testified that, when their mother returned to Robinson in February 2002 after being hospitalized for pneumonia, she was given a poor prognosis. But she improved somewhat and began eating and drinking more. However, both women later became concerned about whether their mother was receiving adequate food and water at Robinson when she began losing weight in May or June 2002. On occasion, they saw their mother's food and water on a tray across the room, out of her reach. They also said that the family requested that Ensure be added to their mother's diet when she began losing weight but that it was a long time before it was provided. Additionally, they observed that their mother appeared thirsty and that she drank two or three glasses of water when they offered it to her. Mrs. Borecky testified that, on several occasions, she found her mother in a dirty diaper with feces under her nails and on the bed rails. She said that staff was sometimes available to change her mother but, at other times, she had to find someone. Both ladies were aware that their mother had bed sores but testified that they were not informed of the extent of them. They com-

plained to the Robinson staff and expressed concern about these situations. It was appellant's opinion that Robinson was not always fully staffed.

Several Certified Nursing Assistants (CNAs) who formerly worked at Robinson testified that they sometimes had difficulty completing their tasks due to lack of staff. Sylvia Molden said that when the facility was short of staff, her resident load increased from ten to seventeen. Among the things that were difficult to accomplish under those circumstances, she said, were turning the residents, feeding them breakfast in a timely manner, taking residents to the bathroom, encouraging fluid intake, and changing the residents. She also said that, if the facility was short of staff, the CNAs would, on the advice of the nurses, leave their documentation blank and fill it in later. Molden testified that she complained to the charge nurse about the staffing and it got better at times. Additionally, she said, during a state survey the floor would be fully staffed but, after the State left, the staffing level would be short again. Molden recalled Mrs. Mince being a resident at Robinson, and she said that she tried to reposition Mrs. Mince every two hours but was not always able to do so. She said that she often found Mrs. Mince and other residents soiled or wet when she began her shift. Molden also said that Robinson did not always have enough linens when she worked there, although she had all the other supplies she needed.

CNA Pamela Holland testified that she would sometimes notice at the beginning of her shift that Mrs. Mince was lying in urine and that she noticed that Mrs. Mince was always lying on her back. Holland further testified that she sometimes found a can of Ensure on Mrs. Mince's bedside table or on the heater, open and full with a straw in it. According to Holland, the number of residents she was required to care for during a shift depended on "who didn't show up for work." She said that Robinson's Director of Nursing "didn't want to hear any complaints." Holland agreed that, when the facility was appropriately staffed, she could get her job done, and she said that there were enough CNAs to properly care for the residents. Holland also said that Robinson lacked enough sheets, pads, and towels.

CNA Dennise Dockery testified that Robinson did not have enough CNAs at times because people quit or got fired or did not show up. She said she was not able to spend the time she needed with people like Mrs. Mince when the facility was short-staffed. She complained to the Director of Nursing or the floor nurses,

who said they would try to hire more people. Short-staffing prevented water from being passed out sometimes, she said, and she sometimes did not have the supplies she needed. Dockery worked with Mrs. Mince "about twice" and saw her wet and needing to be changed. She also saw other residents who had been left in their own waste for a long period of time. Dockery testified that staffing levels would change when "the State came in the building."

Dr. David Liu testified that he provided medical services to Robinson and was the treating physician for Mrs. Mince. He visited Robinson once a month and depended on the nurses to keep him informed. He said that no one at Robinson discussed staffing levels with him. He agreed that, to provide adequate care to residents, "you have to have sufficient staff." However, he had no opinion about whether staffing had anything to do with the care and treatment given to Mrs. Mince. He agreed that Robinson should follow federal regulations regarding staffing and that residents should be kept clean, comfortable, properly hydrated, and repositioned. He observed that, when Mrs. Mince began developing pneumonia symptoms in February 2002, her chart showed no entries for a thirty-six hour period between February 14 and February 16, when she was hospitalized. Further, her chart at Robinson *did* show activity for Mrs. Mince on days when she was actually in the hospital. Dr. Liu said that these charting errors concerned him and were inappropriate. But, he testified that he could not say whether he saw any evidence of neglect of Mrs. Mince while he was caring for her.

LPN Deborah Vasquez was the skin-treatment nurse at Robinson and was familiar with Robinson's procedures and protocols for pressure sore management. She was not sure who asked her to take that position but believed it was the facility's Director of Nursing and probably a nurse consultant who was employed by a predecessor to CANC. Vasquez was responsible for skin assessments on all ninety of Robinson's residents. She said she was a little overwhelmed on some days and complained about the situation to other nurses and to the assistant Director of Nursing. She recalled being in Mrs. Mince's room and said that she did assessments on Mrs. Mince weekly toward the end of Mrs. Mince's life. She said that an updated care plan might have helped Mrs. Mince. She also observed that flow sheets from June 2002 and afterward indicated that Mrs. Mince might not have been repositioned like she should have been nor was she eating like she should have.

According to Vasquez, the only training she received before taking the position of skin-treatment nurse was on-the-job training and a few seminars; no one at Robinson, including a nurse consultant, had trained her. But, she said, "after CANC took over," she went to Fort Smith for training. She also testified that she had training "with different wound care whenever I started nursing." Vasquez explained that she did not order a pressure-alternating mattress for Mrs. Mince when her skin first began to break down in June 2002 because Mrs. Mince did not yet have open areas and that her "skin issues" were not at the stage where the mattress was needed. She said that the decision to provide the mattress in August 2002 belonged to hospice and the doctors. However, she referenced an earlier deposition, in which she said that she was not trained enough to know that she could get a pressure-alternating mattress.

Appellant's expert, Dr. Loren Lipson, testified that Mrs. Mince's care and treatment was sub-standard in several respects: the failure to monitor her for a thirty-six-hour period when her pneumonia began in February 2002; chart errors and gaps in nursing notes; the failure to add nutritional supplements, encourage fluids, or timely intervene in Mrs. Mince's weight loss; and the improper and delayed care of pressure sores. Dr. Lipson said that the situation at Robinson may not just have been the people who were there, such as CNAs and nurses, but "may have been failure to have enough people there" and could be "a systemic problem from, basically, what is the budget to be spent on these individuals and who decides how much. . . ." He said that he was critical of Robinson's CNAs, nurses, and employees "in addition to, potentially, the administration who governs how the nursing care is given. . . ." Dr. Lipson also referenced his earlier deposition, where he mentioned "what maybe had been a situation of lack of training of staff," though he said that he had no documentation of that.

RN Betty Bennett was employed by NCI during the time that Mrs. Mince was a resident at Robinson. She said that NCI provided consulting services to nursing homes "affiliated with CANC." Upon request, she would assist the homes with "assuring that they had systems and processes in place to provide good quality of care." Robinson was one of the primary homes for which Bennett had consulted. In fact, for two days in March 2002, she served as Director of Nursing at Robinson. Bennett was familiar with state guidelines concerning residents' rights and

federal regulations regarding staff training, resident assessment, pressure sores, and development of policies and procedures. As an example of her work, she said that, when going into a facility to address a problem with pressure sores, she would meet with the DON to discuss protocol within the facility. And, she said, "if I identify an area that I thought could be enhanced upon in a different way, then we would have that discussion." This would entail checking to see if preventative mattresses were in place; looking at a resident's care plan; possibly meeting with the treatment nurse "to make certain that she knows that if a [sore] does not improve within two to four weeks, that they change the treatment"; and discussing other factors such as nutrition, bathing, and repositioning. Bennett also said that the question of whether lack of staffing might be responsible for services not being delivered to a resident was a question she would ask a DON. However, she said, her supervisor, Julie Harrod, would be the one who worked with the nursing homes to improve staffing. Bennett said that she did not do hands-on nursing or make rounds to check residents as part of her consulting work.

According to Bennett, when she first began working with Robinson, it was a "focus facility," meaning that it was the subject of heightened scrutiny by the State. She reviewed Robinson's surveys with its DON, and one survey reflected inadequate staffing over four shifts during a two-week period in June 2002. Bennett said that, as part of her job when she started consulting at Robinson, she looked at the facility's records on occasion and made suggestions as to residents' care. She agreed that it would be fair to say that some of the residents' issues she looked at were problematic. She said that, if she went into a facility and "saw something," she would make a recommendation about how to resolve or improve a problem. She said that, during her visits to Robinson in 2001 and 2002, the facility was not without the resources it needed to implement her suggestions. Bennett also said that she had attended meetings regarding clinical care and training in Fort Smith and that CANC representatives and Michael Morton were present on some occasions. She testified that CANC provided administrative services to some of the same facilities for which she consulted but that she never communicated with anyone at CANC, other than through presentations at meetings. Her supervisor Julie Harrod spoke with CANC, she said, but Bennett did not know who Harrod spoke with and did not relate the subject of their conversations.

Michael Morton testified that he owned stock in twenty-five nursing homes, including Robinson. According to him, Robinson was considered one of the worst nursing homes in Arkansas when he purchased a fifty percent interest in it in 2001. Morton had developed NCI, in which he was the sole stockholder, to help his nursing homes that might be having problems with a survey or certification and to help administrators hire proper personnel. Near the time he purchased an interest in Robinson, he hired Julie Harrod at NCI to "head up the administrative area" and supervise various NCI employees. In particular, Harrod was to direct the nurse-consultants to where they were needed most and to facilities that were having the most problems. Harrod hired Betty Bennett and was Bennett's supervisor.

Morton said that he used NCI to get Robinson "back on its feet." According to Morton, Betty Bennett was helpful in "dealing with the survey process and plans of correction." And, he said, if there were "patient-care issues," Bennett could work with the DONs. He further said that Bennett would normally have talked to Julie Harrod about any care issues at Robinson and that, if any intervention was taken as the result of a survey, it would be by the in-house administrator or DON, or by NCI. He further said that it would have been NCI's responsibility to go over facility manuals and look at policies and procedures. Morton said that he did not have contact with Bennett on a day-to-day basis, look at facility surveys, or manage the day-to-day operations of any nursing home. He was generally contacted regarding such things as re-placement of appliances or heating and cooling systems or how much to pay management personnel. He also remembered Julie Harrod asking "on the very first day we took over" to give everybody a one-dollar-per-hour raise. He acknowledged that he and his partner, Rick Griffin, were the "governing body" of Robinson.

Morton testified that he was also the sole stockholder in CANC, which provided financial services to nursing homes in which he held an interest. CANC's administrative services agreement with Robinson stated that CANC would provide such things as Medicare billing support, payroll processing, administration of employee-benefit plans, and accounts payable and receivable. The agreement also stated that CANC would "cooperate and assist [NCI] as requested to schedule quarterly risk management training for facility staff." Morton said that seminars were held at CANC offices in Fort Smith and that it was usually NCI who decided what

topics to cover at educational meetings, although CANC might develop financial-related topics. Morton also testified that he did not have budgets but that he had never denied the people running Robinson anything. This testimony was basically confirmed by Morton's partner in Robinson, Richard Griffin.

At the close of the above evidence, appellees moved for directed verdicts on the basis that appellant had not proven that they owed a duty to Mrs. Mince or, if a duty existed, that they breached the duty and proximately caused Mrs. Mince's injuries or death. The trial court granted the motions, from which appellant now appeals.

### C. Discussion of Appellant's Arguments

Appellant argues that appellees were responsible for the under-staffing and lack of training and supervision at Robinson, which ultimately led to Mrs. Mince's injuries and death. The essential elements of a cause of action for negligence are that the plaintiff show a duty owed and a duty breached, and that the defendant's negligence was a proximate cause of the plaintiff's damages. *See Wagner v. Gen. Motors Corp.*, 370 Ark. 268, 258 S.W.3d 749 (2007). In a wrongful-death case, the plaintiff must show that the defendant's negligence was the proximate cause of the decedent's death. *See generally Rose Care, Inc. v. Ross*, 91 Ark. App. 187, 209 S.W.3d 393 (2005); AMI Civ. 2216 (2007). Proximate cause is defined, for negligence purposes, as that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *Wal-Mart Stores, Inc. v. Kilgore*, 85 Ark. App. 231, 148 S.W.3d 754 (2004). With these authorities in mind, we review the directed verdicts as to each appellee.

### 1. CANC

CANC was under contract to provide billing and accounting services to Robinson. Appellant's proof shows no substantial evidence that CANC supervised Robinson employees or had any responsibility for the number of staff on duty at Robinson during Mrs. Mince's time there. It is true that CANC was contractually bound to cooperate with and assist NCI in scheduling quarterly risk-management training. But only sheer conjecture could equate that logistical obligation with a duty to provide clinical training to the Robinson staff in matters such as

skin care, nutrition, and hydration. Appellant's reliance on the deposition testimony of skin care nurse Deborah Vasquez that she was not well-trained enough to order a pressure-alternating mattress for Mrs. Mince is unavailing because appellant fails to connect this alleged lack of training to any error or omission on CANC's part beyond speculation. In fact, Vasquez testified that she received training "after CANC took over." Appellant additionally mentions that some employees of "the entities owned by Mr. Morton, like NCI, have CANC email addresses." While this fact establishes an affiliation among the entities in this case, it does not constitute substantial evidence that CANC was negligent or that CANC contributed to Mrs. Mince's injuries or death. We therefore affirm the directed verdict as to CANC.

## 2. Michael Morton

Shareholders are not ordinarily liable for the acts of their corporation or LLC. Ark. Code Ann. § 4-27-622(b) (Repl. 2001). But shareholders and employees may be liable for their own acts or conduct. See id. See also McGraw v. Weeks, 326 Ark. 285, 294, 930 S.W.2d 365, 370 (1996) (holding that a corporate employee may be sued if he is "personally involved in the events surrounding an injury"). Appellant argues that she presented substantial evidence in this case to hold Morton directly liable for his own conduct. We disagree.

Appellant succeeded in establishing a link between Morton and the other appellees, and she established that Morton undertook any number of executive responsibilities to ensure Robinson's continuity. What is missing is any evidence beyond conjecture that Morton was charged with staffing, training, or supervision at Robinson or that his actions proximately caused Mrs. Mince's injuries or death. Appellant points to Morton's testimony that he considered himself and his co-shareholder the "governing body" of Robinson. According to appellant, this status made Morton "responsible for management of the facility." See 42 CFR 483.75(d) (providing that a facility's "governing body" is responsible for establishing and implementing policies regarding management and operation of the facility and for appointing an administrator who is responsible for management). We differ with appellant's interpretation of this regulation. It requires the governing body to establish and implement *policies* regarding management but recognizes that management is the function of the facility

administrator. Appellant offered no evidence at trial, and makes no argument on appeal, that Morton failed to implement proper policies or that he hired an ineffective administrator.

Appellant also tries to characterize Morton's use of NCI to assist in hiring proper personnel, and Morton's testimony that he was responsible for hiring "professional" people, as evidence that Morton was responsible for ensuring that enough staff was present at Robinson. It cannot be reasonably inferred from these statements that Morton was responsible for the number of staff on the floor at Robinson during Mrs. Mince's tenure. Conjecture and speculation, however plausible, cannot be permitted to supply the place of proof. *Mangrum v. Pigue*, 359 Ark. 373, 198 S.W.3d 496 (2004).

Appellant makes the implied argument that Morton engaged in a corporate philosophy that put profits ahead of resident care. Whatever deficiencies in staffing or training that might have existed at Robinson (and the jury apparently was not persuaded that there were any that accounted for the death of Mrs. Mince), we see no evidence beyond speculation that they were attributable to Morton's corporate philosophy. No witnesses testified that they were denied anything for reasons of budget cuts or lack of funds, nor did any witness testify that Morton employed a profits-before-care philosophy. *Compare Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003), where a former vice-president of the company testified to a change in philosophy that placed profits over patient care.

Finally, the cases relied upon by appellant in support of her case against Morton are distinguishable; they involve situations in which the defendant's liability was undisputedly based on his own conduct that led directly to the plaintiff's damages. *See McMickle v. Griffin*, 369 Ark. 318, 254 S.W.3d 729 (2007) (holding that the owner of a tractor could be held liable as the tractor-driver's employer or for his own negligent provision of the tractor and supervision of the driver); *McGraw, supra* (holding a corporate employee personally liable for the plaintiff's damages where he unquestionably made the very decision that caused the plaintiff's injury); *Canavan v. Nat'l Heathcare Corp.*, 889 So. 2d 825 (Fla. Ct. App. 2004) (reversing a directed verdict for a shareholder who ignored complaints of inadequate staffing while cutting operating expenses, where the evidence indicated that the plaintiff's injuries were the direct result of under-staffing); *Forsythe v. Clark USA, Inc.*, 836 N.E.2d 850 (Ill. Ct. App. 2005) (reversing a summary

judgment for a parent company whose budget cuts affected the ability of a subsidiary to hire trained personnel, where the lack of training led directly to the plaintiffs' deaths). Appellant produced no substantial evidence that Morton cut expenses or that his monetary decisions adversely affected the level of care at Robinson.

We therefore affirm the directed verdict in Morton's favor.

## 3. NCI

■ We reverse and remand the directed verdict in favor of NCI because appellant presented substantial evidence from which a jury could reasonably conclude that this entity was negligent and that its negligence was a proximate cause of Mrs. Mince's injuries and death. It is plain from the proof that NCI was directly involved in the provision of care at Robinson during the time that Mrs. Mince's condition began to deteriorate. Nurse Betty Bennett reviewed Robinson's surveys, including one in June 2002 that showed inadequate staffing, and there were occasions when Bennett looked at Robinson's records and made recommendations concerning residents' care. Additionally, Bennett served as DON at Robinson for a two-day period in June 2002, which could be viewed as evidence of her familiarity with and responsibility for the conditions at Robinson. It is further evident that NCI possessed an expertise in the provision of care in nursing homes. A jury might consider Bennett's detailed testimony of the actions she would take if confronted with a facility that experienced trouble in treating pressure sores as the actions that NCI should have taken in this case, had NCI exercised its expertise and followed its mandate of assisting problematic facilities. This is especially true here, where Robinson had been deemed one of the worst facilities in the state in the not too distant past. There was also testimony from Bennett that her supervisor, who was hired by NCI, worked with the nursing homes to improve staffing. We conclude that these facts rise to the level of substantial evidence, and we hold that the directed verdict in favor of NCI was improperly granted.

## III. Motion for New Trial

Appellant argues that a new trial should have been granted because a potential juror gave a false answer during voir dire, causing her to expend a peremptory challenge to remove him.

## A. Standard of Review

Our standard of review for denial of a new trial on grounds of juror misconduct was explained in *Diemer v. Dischler*, 313 Ark. 154, 852 S.W.2d 793 (1993):

> When a new trial is requested because of juror misconduct under the rubric of Ark. R. Civ. P. 59(a), the moving party must show that the party's rights have been materially affected by demonstrating that a reasonable possibility of prejudice has resulted from the misconduct. We have held that prejudice, in such instances, is not presumed. Trial courts are vested with great discretion in acting on motions for a new trial, and, in a case in which a new trial is requested on the ground of juror misconduct, we will not reverse the trial court's denial unless there is a manifest abuse of that discretion.

*Id.* at 160, 852 S.W.2d at 796 (citations omitted).

## B. Events During Voir Dire

The venireman at issue was William Watson. Mr. Watson was asked by appellant's counsel both personally and as part of the venire if he "had ever been involved in any litigation," "had been sued for personal injury," or "had a civil judgment against" him. Watson answered, "No," or gave no response. After questioning of the venire was concluded, appellant's counsel approached the bench and told the court that she had proof Mr. Watson had "civil judgments pending against him. So clearly he lied." The court said, "I'm sorry, at this point, I'm not going to do anything." Appellant used a peremptory strike on Watson, and the jury was seated.

Thereafter, appellant's counsel reiterated to the court that she had reason to believe that Watson had civil judgments pending against him, though he did not admit it during voir dire. Counsel then said, "we asked that he be struck for cause and were denied." Counsel further said that, if Watson had been struck for cause, she would have used her remaining peremptory strike on juror Vancura, who sat on the case. The court said, "If you had brought this up before it had been closed I would have allowed you to examine him on it more. I'm not convinced he lied. I think he may have been mistaken, and that's the reason I didn't do it for cause." After trial, appellant moved for a new trial on the ground of juror

misconduct. She attached a public-records report showing that a William Watson had a bankruptcy, several state tax liens, and some civil judgments against him. The motion was deemed denied, and appellant now appeals from that denial.

## C. Discussion of Appellant's Arguments

Appellant argues that the trial court erred in not excusing Watson for cause and in not inquiring into the reasons behind his response. We find no abuse of discretion.

Watson was never seated on the jury. In *Willis v. State*, 334 Ark. 412, 977 S.W.2d 890 (1998), the supreme court explained:

> It is well settled that the loss of peremptory challenges cannot be reviewed on appeal. The focus should not be on a venireperson who was peremptorily challenged, *but on the persons who actually sat on the jury.* Because Ms. Howard and Ms. Wooley were not seated on the jury, we need not consider whether they should have been struck for cause.

> Appellant then argues that because he was forced to exercise two peremptory challenges on Ms. Howard and Ms. Wooley and exhausted his challenges, he had no challenges available to use to strike juror Nancy Beene, who had stated that she would have a problem with affording appellant the presumption of innocence. We have said that in order to challenge a juror's presence on appeal, the appellant must have exhausted his peremptory challenges *and must show that he was forced to accept a juror who should have been excused for cause. Appellant must have asked the court to remove the juror for cause, and the court must have improperly denied the request.*

*Id.* at 420-21, 977 S.W.2d at 894-95 (citations omitted) (emphasis added).

■■ Appellant does not argue that she was forced to accept a juror who should have been excused for cause. Therefore, under the rule stated in *Willis*, her argument on this point must fail. As for appellant's contention that the trial court should have conducted an inquiry into Watson's answers on voir dire, she did not ask the court to do so, nor did she ask the court to allow her to probe further into Mr. Watson's responses or lack thereof. We decline to address this issue for the first time on appeal. *See generally Lewis v. Robertson*, 96 Ark. App. 114, 239 S.W.3d 30 (2006).

### III. Conclusion

We affirm the directed verdicts in favor of appellees Morton and CANC, and we affirm the denial of appellant's motion for a new trial. We reverse and remand the directed verdict in favor of NCI.

Affirmed in part; reversed and remanded in part.

VAUGHT and BAKER, JJ., agree.