2010 Ark. App. 203

**Charles V. GRASSI, Sr., Appellant**

**v.**

**James W. HYDEN and Hyden, Miron & Foster, PLLC, Appellees.**

**No. CA 08–1405.**

Court of Appeals of Arkansas.

March 3, 2010.

Rehearing Denied April 14, 2010.

Paul Sloan Rainwater, Griffin, Rainwater & Draper, P.L.C., Crossett, for appellant.

Bettina Ellen Brownstein, Caley B. Vo, Wright, Lindsey & Jennings LLP, Little Rock, for appellees.

LARRY D. VAUGHT, Chief Judge.

This is a legal malpractice case filed by Charles Grassi, Sr., against appellees James Hyden and his firm, Hyden, Miron & Foster, PLLC. Grassi appeals from the circuit court's entry of judgment on a directed verdict for appellees.[1]  We affirm.

In the late 1990s, Hyden and Grassi discussed Grassi's options regarding the disposition of his majority interest in Pierce–Grassi Lumber Company, Inc., in Crossett, upon his retirement.  One of the options they discussed was the formation of an Employee Stock Ownership Plan (ESOP), which would purchase Grassi's shares in the corporation.  When an owner of a business creates an ESOP, he sells his shares to the ESOP, which borrows money for the purchase.  The business makes annual contributions to the ESOP, which uses the money to retire the debt; over time, the debt is repaid, and the employees have separate retirement accounts containing shares in the business.  ESOPs must be created in compliance with the Internal Revenue Code, which mandates that the annual contributions to the ESOP cannot exceed twenty-five percent of the W–2 compensation of employees who are eligible to participate in the plan.  The allocations must be sufficient to service the debt.

Following Hyden's advice, Grassi entered into a purchase agreement with the business and the ESOP on June 2, 1999. Grassi sold 380 shares of the corporation to the ESOP in exchange for $725,900.

---

1.  The parties filed a motion to transfer this case to the Arkansas Supreme Court.  The motion was denied on May 14, 2009.

The First National Bank of Crossett financed the sale with a loan of $625,000 to the corporation, which loaned that amount to the ESOP. The corporation paid for the balance of the purchase with contributions to the ESOP. First National Bank took a security interest in Grassi's investment account containing the $725,900. In this transaction, Grassi transferred his remaining shares of stock to the corporation in exchange for a promissory note in the amount of $439,100.

For a few years, the lumber company managed to make all of the payments, but it was forced to close in 2004. Grassi liquidated his investment account securing the loan to First National Bank to repay that debt. Not only did Grassi lose over $260,000 to First National Bank, he could not collect the unpaid balance due on the promissory note from the business. Grassi then filed suit against appellees, asserting negligence by Hyden in advising him to sell his shares of the company to the ESOP.

Grassi testified and presented the testimony of Hyden; Wyck Nisbet, a Little Rock attorney; David Rodgers, of Rodgers Financial Group, where Grassi invested the proceeds of the sale; Nenda Burchfield, who worked for the lumber company from 1976 until it closed and succeeded Grassi as president; Glenn Borkowski, an attorney; and Mary Jane Grassi, appellant's wife. Hyden testified at length about ESOPs in general and how this ESOP was created. He stated that the first step is to see if the contributions based on a percentage of the payroll will be sufficient to service the debt. To that end, he asked a lawyer in his firm, Borkowski, to prepare a feasibility study in April 1998. Borkowski's feasibility study included five possible scenarios. According to Hyden, he did not actually use the study "other than to see basically, are we

in the ballpark." He said that he did not "look to see if any of these particular scenarios were 'workable'" and that he did not think that they were applicable or helpful to the actual ESOP that they established. Hyden stated that he later ran his own feasibility study in his head. He said that, although he reviewed Borkowski's feasibility study "early on," he did not review it thereafter: "I have previously said that none of these scenarios would work—none of the scenarios that Mr. Borkowski ran is applicable to what occurred with the Pierce–Grassi Lumber Company." Hyden emphasized that the study had nothing to do with the business of the lumber company and said that he had not intended to give Grassi any business advice. He also said that they did not discuss the ability of the company to service all of the debt.

Wyck Nisbet testified about the general process of creating an ESOP, and stated that a feasibility study is a critical part of deciding whether to form one. He explained that there are strict statutory and regulatory rules governing ESOPs and that the cost of starting and maintaining an ESOP is high because it requires a lot of legal time:

If you have an ESOP go bad, the problems are terrible. I never want to set up an Employee Stock Ownership Plan for a client when I think there is an unreasonable degree of possible failure—ability to meet the loan obligations. When you have an ESOP, you have employees that their retirement futures— the stock of the company is their retirement. You normally don't want to take chances on an ESOP, or I do not. I have seen many attorneys who won't even set up an ESOP. That is because of the high risk of things going wrong. They are high maintenance because most people do not understand all the

technical rules that are associated with maintaining an Employee Stock Ownership Plan.

Nisbet did not testify that Hyden had fallen below the standard of care. He said: "If Mr. Hyden, in looking at all the information available to him, felt that the ESOP was going to be a successful arrangement and recommended it, he was doing what I would do." He continued: "I don't have any basis to believe that if Mr. Hyden had thought that the ESOP wouldn't work, he would have gone ahead with it." He also did not know if this ESOP adversely affected the lumber company's profitability.

■ At the conclusion of Grassi's case, appellees moved for directed verdict on the grounds that Grassi had not provided any expert testimony as to the standard of care; that Hyden fell below that standard; or that his alleged negligence caused any harm to Grassi. Grassi's attorney argued that he had satisfied the burden of proof by introducing the testimony of Nisbet and Borkowski, and asserted that expert testimony was not necessary because this case fell within the "common-knowledge" exception. He contended that this case did not require any expert testimony to the effect that a lawyer has an obligation to disclose information to his client in making decisions. Counsel for appellees responded that no expert had testified that the feasibility study showed that this particular ESOP was not feasible or showed whether Hyden actually relied upon the feasibility study. She pointed out that none of Grassi's witnesses had linked the feasibility study to this particular ESOP or had testified that Hyden had fallen below the standard of care. She argued that whether such a study indicates if it is feasible to go forward with a particular ESOP is a very complex subject that is not within the common understanding of a jury.

The court granted the motion for directed verdict on the ground that, because this subject was not within the common knowledge of the jury, Grassi should have produced expert testimony. After the circuit court entered judgment on the directed verdict for appellees, Grassi brought this appeal.

■ In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Scott v. Cent. Ark. Nursing Ctrs., Inc.*, 101 Ark. App. 424, 428, 278 S.W.3d 587, 590 (2008). A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Scott*, 101 Ark. App. at 428, 278 S.W.3d at 590. Stated another way, a motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Id.* at 428, 278 S.W.3d at 590. Where the evidence is such that fairminded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.* at 428, 278 S.W.3d at 590–91. Substantial evidence is evidence of sufficient force and character to induce the mind of the fact finder past speculation and conjecture. *Id.* at 428, 278 S.W.3d at 591.

Grassi argues on appeal that the trial court erred in directing the verdict in favor of appellees because the feasibility study demonstrated that the cash flow available to the ESOP was not sufficient to service the debt incurred by the ESOP, and that Hyden advised him to enter into the transaction without disclosing the adverse implications of the study. He contends that expert testimony was not neces-

sary at trial because this issue was within the common-knowledge exception to the rule requiring expert testimony in legal-malpractice cases.

■ An attorney is negligent if he or she fails to exercise reasonable diligence and skill on behalf of a client. *Barnes v. Everett,* 351 Ark. 479, 485–86, 95 S.W.3d 740, 744 (2003). To prevail on a claim of attorney malpractice, a plaintiff must prove that the attorney's conduct fell below the generally accepted standard of practice and that such conduct proximately caused the plaintiff damages. *Barnes,* 351 Ark. at 486, 95 S.W.3d at 744. To prove damages and proximate cause, the plaintiff must show that, but for the alleged negligence of the attorney, the result in the underlying action (in this case, the failure of the business) would have been different. *Id.* at 486, 95 S.W.3d at 744. In this respect, a plaintiff must prove a case within he must prove the merits of the underlying case as part of the proof of the malpractice case. An attorney is not liable to a client when, acting in good faith, he or she makes mere errors of judgment. *Id.* at 486, 95 S.W.3d at 744.

■ Our case law has consistently held that the attorney's conduct must be measured against the generally accepted standard of practice. *Barnes v. Everett,* 351 Ark. 479, 486, 95 S.W.3d 740, |₇744 (2003). Such a measurement plainly requires expert testimony as to what the standard of practice is, unless the trial court determines that such testimony is not necessary because the case falls within the common-knowledge exception to the rule.[2] *Barnes,* 351 Ark. at 486, 95 S.W.3d at 744; AMI Civ. 1510 (2009). Other courts have said that this exception applies when "the con-

duct claimed to be negligent is so clear it can be recognized or inferred by a person who is not an attorney." *Benton v. Nelsen,* 502 N.W.2d 288, 290 (Iowa App.1993). In *Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 480 (3d Cir.1979) (applying Pennsylvania law), the federal appellate court said that expert testimony would be required "except where the matter under investigation is so simple, and the lack of skill so obvious, as to be within the range of the ordinary experience and comprehension of even non-professional persons."

We agree with the circuit court that the "common-knowledge" exception did not apply and that expert testimony was necessary in this case. Nisbet's testimony alone was sufficient to show that expert testimony was needed. He testified about the many restrictions placed on ESOPs by the Internal Revenue Code and described them as "high maintenance." Borkowski's testimony about the intricacies of forming an ESOP also demonstrated the need for expert testimony. Additionally, Burchfield was ignorant about ESOPs before this one was created. She stated: "I did not know what an ESOP was until Mr. Hyden explained to everybody what an ESOP was." She said that, when she went to the bank to apply for the loan, she brought Hyden |₈with her so he could explain the transaction. Burchfield testified that Hyden met with her, Grassi, and others before the closing because they "wouldn't have known what to do." Grassi also explained that, before Hyden told him about the ESOP option, he knew nothing about ESOPs: "He gave me a magazine article and I tried to read it. I still didn't understand anything about ESOPs." Additionally, Grassi

---

**2.** In medical-malpractice cases, the supreme court has indicated that a surgeon's failure to sterilize his instruments or to remove a sponge from the incision before closing it are examples of asserted negligence lying within the comprehension of the jury. *Haase v. Starnes,* 323 Ark. 263, 915 S.W.2d 675 (1996).

produced no evidence that the feasibility study predicted that the ESOP that was actually created fourteen months later might not work. Nothing in the evidence, therefore, established the standard of care or showed that Hyden breached it. The circuit court did not err in directing a verdict for appellees.

Affirmed.

KINARD and GRUBER, JJ., agree.