2012 Ark. App. 301

Donna WATKINS, Administrator
of the Estate of Frances
Watkins, Appellant

v.

ARKANSAS ELDER OUTREACH
OF LITTLE ROCK, INC., et
al., Appellees.

No. CA 11–767.

Court of Appeals of Arkansas.

May 2, 2012.

Rehearing Denied June 20, 2012.

Gene Ludwig, Ludwig Law Firm, David A. Hodges, Little Rock, for Appellant.

Thomas S. Stone, Monte D. Estes, Dover Dixon Horne PLLC, Little Rock, for Appellee.

LARRY D. VAUGHT, Chief Judge.

This case involves a nursing home's defense of charitable immunity in a negligence action brought against it. Donna Watkins, Special Administrator of the Estate of Frances Watkins, and on behalf of the wrongful-death beneficiaries, appeals from summary judgments awarded to appellees, Arkansas Elder Outreach of Little Rock, Inc. (AEO), d/b/a Willowbend at Marion, a nursing home; David Threlkeld, administrator of Willowbend; Healthcare Financial Advisors, LLC (HC Financial); and Douglas Walsh, a director of AEO and an employee of HC Financial. Appellant sued appellees, along with Healthcare Staffing Associates, Inc. (HC Staffing, with which appellant has settled), for negligence that allegedly caused the injuries that Frances Watkins suffered while she was a resident at Willowbend. The circuit court granted summary judgment to AEO on the basis of charitable immunity. It awarded summary judgments to HC Financial, Threlkeld, and Walsh on other grounds. We affirm the summary judgments in favor of HC Financial, Threlkeld, and Walsh, and reverse the summary judgment awarded to AEO.

AEO holds the license and operates Willowbend, along with four other nursing homes in Arkansas. There is no dispute that AEO's articles of incorporation provide that it is a not-for-profit corporation and that it is a tax-exempt section 501(c)(3) organization according to the Internal Revenue Service. Appellant offered evidence that a group of Louisiana investors, led by David McCollister, which had owned the other four nursing homes in Arkansas, created AEO in 2002 as a purportedly charitable organization in order to stay in business without having to purchase increasingly expensive liability insurance. HC Financial provided financial, accounting, and information-technology services to the four nursing homes; it also provided such services to AEO after it was created. In 2005, some of the Louisiana investors purchased a nursing home in Marion, changed its name to Willowbend, and leased the facility to AEO. HC Staffing ostensibly employed the personnel who directly cared for patients at the nursing homes. However, Chris McMorris, the president of HC Staffing (and a part owner in both HC Financial and HC Staffing), admitted that HC Staffing did not actually hire or fire its employees; in fact, AEO made those decisions.

Appellant sued AEO and Walsh for negligence in September 2008. In amended complaints, she added Threlkeld, HC Financial, and HC Staffing as defendants. Appellant alleged that they had breached their duty of care to Ms. Watkins in a number of ways, including failing to comply with the rules and regulations promulgated by the Arkansas Office of Long Term Care, the standards imposed by the United States Department of Health and Human Services, and Arkansas's Long Term Care Residents' Rights Act. Among other affirmative defenses, AEO invoked the charitable-immunity doctrine. In October 2008, appellant filed a motion for ex parte communication with current and former employees of the corporate defendants, to which AEO objected. The circuit court granted this motion as it related to current employees and set conditions on any ex parte communication with former employees.

AEO moved for summary judgment on the basis of charitable immunity and filed copies of its articles of incorporation and bylaws; the IRS's section 501(c)(3) deter-

mination; and an affidavit by Walsh, who stated,

[AEO] accepts patients that cannot pay, for whom they then attempt to obtain Medicaid payments. [AEO] retains care of such residents even if Medicaid benefits are not obtained. [AEO] does not earn a "profit" and any "surplus" is used to operate and improve nursing and facility services and to offset the cost of those residents who are unable to pay or fully pay. [AEO's] monetary goal is to break even while providing its nursing care services.

In response, appellant asserted that the doctrine of charitable immunity should be abolished; that public policy should not allow an entity that chose to operate in such a poor manner and without insurance to escape liability under the guise of charitable immunity; and that genuine issues of material fact existed regarding the application of the charitable-immunity doctrine to this case. Appellant filed a number of exhibits, including the deposition of Walsh, the nursing homes' balance sheets, Willowbend's departmental-income statements, and records from the Office of Long Term Care.

On March 5, 2009, the circuit court granted summary judgment to AEO:

However, in the present case Arkansas Elder Outreach of Little Rock, Inc. has satisfied all but one of these factors [that courts consider to determine charitable-immunity status] and that is this Defendant is not dependent on donations and contributions for its existence. Arkansas Elder Outreach of Little Rock, Inc.'s earnings are used to pay reasonable compensation for services rendered to the entity and to make payments in furtherance of its charitable purposes. Any "profit" or surplus is used for charitable purposes such as improving the facilities and services and to maintain the ability to provide services to those unable to pay. As in the *George* [*v. Jefferson Hospital Association,* 337 Ark. 206, 987 S.W.2d 710 (1999)] case, the lack of reliance on contributions and donations does not negate the Defendant's entitlement to charitable immunity.

. . . .

Plaintiff encourages the Court to overrule the charitable immunity doctrine. The applicable law in Arkansas is that charitable entities are immune not only from executions of judgments but from being sued. *Sowders v. St. Joseph's Mercy Health Center,* 368 Ark. 466, 247 S.W.3d 514 (2007). It is for the legislature and not the courts to determine whether the doctrine of charitable immunity should be abolished in Arkansas. This long standing precedent must be followed. The Court is without authority and is obliged to follow the decisions of the Arkansas Supreme Court. *Breckenridge v. Ashley,* 55 Ark.App. 242, 934 S.W.2d 536 (1996).

Walsh also moved for summary judgment, arguing that he could only be liable for his own actions and not those of the corporation; that appellant provided no evidence that he failed to fulfill his obligations; and that, because he was not a licensee, he could not be liable under the residents' rights statute, citing his deposition and his supplemental affidavit:

3. In my position as a director of Arkansas Elder Outreach, I perform oversight and administrative functions for all five of the nursing facilities run by Arkansas Elder Outreach, including Willowbend. In such role, I have not in the past, nor do I presently, take any part in the day-to-day operations of any facility, nor do I participate in any way with the decisions relating to care and/or treatment of any individual residents of any of the facilities. Other than facility

administrators and the director of nursing, I take no role in the staffing of any of the facilities, nor do I participate in the training or supervision of facility staff.

4. Concerning a former resident of Willowbend, Frances Watkins, I was never personally involved in any way regarding care or treatment of Ms. Watkins, nor was I involved in any way, nor did I participate in any decision regarding care or treatment of Ms. Watkins.

Walsh renewed his motion for summary judgment in August 2009. With her response, appellant filed copies of letters from Willowbend's office manager to the Office of Long Term Care reporting staffing shortages in January, February, April, and July 2007. Walsh replied with the additional affidavit:

3. In my position as a non-voting member of the Board of Directors of Arkansas Elder Outreach, I perform advisory and administrative functions for all five of the Facilities run by Arkansas Elder Outreach, including Willowbend. In such role, I have not in the past, nor do I presently, take any part in the day-to-day operations of any facility, nor do I participate in any way with decisions relating to care and/or treatment of any individual residents of any of the facilities. Other than facility administrators and the director of nursing, I have no role in the employment of the staff of any of the Facilities, nor do I participate in the training or supervision of facility staff.

4. Health Care Staffing Associates assists each facility Administrator in the preparation of annual budgets for all nursing homes run by Arkansas Elder Outreach, including Willowbend. Neither Healthcare Staffing nor I have any role in approving the budget for Willowbend. Annual budgets for Willowbend and other homes run by Arkansas Elder Outreach are approved by the Board of Directors.

5. At all times during my service on the Board of Directors of Arkansas Elder Outreach, which includes the time Frances Watkins was a resident at Willowbend, Willowbend has been provided with sufficient funds, resources, and staffing to meet both the requirements of the Arkansas Office of Long Term Care and to insure patient well being. At no time were any funds or resources that were required to operate Willowbend withheld or restricted by the Board of Directors of Arkansas Elder Outreach.

6. Concerning a former resident of Willowbend, Frances Watkins, I was never personally involved in any way regarding care or treatment of Ms. Watkins, I was not involved, nor did I participate in any decision regarding care or treatment of Ms. Watkins.

Threlkeld also moved for summary judgment, arguing that appellant had not established that he had a duty of care or that he had breached it; that the federal regulations did not create a private cause of action or set forth a standard of care; and that the residents' rights statute could not be enforced against him because he is not a licensee. He stated in his affidavit:

3. In my position as a director of Arkansas Elder Outreach, I performed oversight and administrative functions for all five of the nursing facilities run by Arkansas Elder Outreach, including Willowbend.

4. As administrator of Willowbend, I supervised the day-to-day business operations of the facility, worked to insure compliance with State and Federal laws and regulations, and was responsible for all administrative functions required for

the facility to function efficiently. As administrator of Willowbend I did not participate in any way with decisions relating to specific care and/or treatment of any individual residents of any of the facilities, nor was I personally involved with decisions or treatment of individual residents of the facility.

5. The budget for Willowbend was approved by the Board of Directors of Arkansas Elder Outreach. Health Care Financial Advisors, LLC had no role in approving the budget for Willowbend.

6. At no time during my employment by Arkansas Elder Outreach were any funds or resources that were required to operate Willowbend withheld or restricted by the Board of Directors of Arkansas Elder Outreach. Quite to the contrary, at all times Willowbend was provided with sufficient funds, resources, and staffing to meet both the requirements of the Arkansas Office of Long Term Care and to insure good patient well being.

7. Concerning a former resident of Willowbend, Frances Watkins, I was never personally involved in any way regarding care or treatment of Ms. Watkins, nor was I involved in any way, nor did I participate in any decision regarding care or treatment of Ms. Watkins.

8. At no time during my employment at Willowbend was Willowbend cited by the Office of Long Term Care for under staffing or deficiencies in equipment or supplies.

HC Financial also moved for summary judgment, arguing that it was responsible for payroll and accounting services and was not liable for the acts of AEO; that it could not be liable for a violation of the residents' rights act; and that appellant's claims were barred by the statute of limitations. Appellant responded that a genuine issue of material fact existed as to whether HC Financial was responsible for ensuring that the services set forth in the admission agreement were provided to Ms. Watkins. She filed copies of records with the Office of Long Term Care; an agreement between HC Staffing and AEO; and the depositions of Walsh and Chris McMorris.

On September 20, 2010, the circuit court entered summary judgment for Threlkeld on the ground that he did not personally provide direct care to Ms. Watkins; that he did not participate in decisions regarding her care; that appellant failed to establish a standard of care or a duty that Threlkeld owed Ms. Watkins; that the federal regulations did not provide for a private right of action or create a standard of care; and that Threlkeld could not be liable under the residents' rights statute because he was not the licensee. The same day, the circuit court entered summary judgment for Walsh and HC Financial for essentially the same reasons. On May 5, 2011, the circuit court entered a final order dismissing the claims against HC Staffing, which had been settled. Appellant filed a timely notice of appeal.

Summary judgment may be granted by a trial court only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, clearly show that there are no genuine issues of material fact to be litigated and the party is entitled to judgment as a matter of law. *Mercy Health Sys. of Nw. Ark., Inc. v. Bicak*, 2011 Ark. App. 341, 383 S.W.3d 869. When the movant makes a prima facie showing of entitlement, the respondent must meet proof with proof by showing a genuine issue as to a material fact. *Id.* When a party cannot present proof on an essential element of a claim, the party moving for summary judgment is entitled to judgment as a matter of law. *Id.* On appeal, this

court need only decide if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. *Id.* In making this decision, we view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Summary judgment is improper when there are genuine issues of material fact as to a party's intent. *Id.* Summary judgment should be denied if reasonable minds might reach different conclusions from the undisputed facts. *Id.*

■ In her first point, appellant asks us to abolish the charitable-immunity doctrine, which we cannot do. On a number of occasions, the supreme court has refused to abolish the doctrine, explaining that it is a public-policy decision for the General Assembly, not the courts, to make. *Scamardo v. Sparks Reg'l Med. Ctr.,* 375 Ark. 300, 289 S.W.3d 903 (2008). We must follow the precedent set by the supreme court and are powerless to overrule its decisions. *Rice v. Ragsdale,* 104 Ark.App. 364, 292 S.W.3d 856 (2009); *Breckenridge v. Ashley,* 55 Ark.App. 242, 934 S.W.2d 536 (1996).

■ In the next point, appellant argues that the circuit court erred in ruling that the charitable-immunity doctrine applies to AEO as a matter of law. The essence of the charitable-immunity doctrine is that agencies, trusts, etc., created and maintained exclusively for charity, may not have their assets diminished by execution in favor of one injured by acts of persons charged with duties under the agency or trust. *Downing v. Lawrence Hall Nursing Ctr.,* 2010 Ark. 175, 369 S.W.3d 8; *Anglin v. Johnson Reg'l Med. Ctr.,* 375 Ark. 10, 289 S.W.3d 28 (2008); *George v. Jefferson Hosp. Ass'n,* 337 Ark. 206, 987 S.W.2d 710 (1999). Because the doctrine favors charities and results in a limitation of potentially responsible persons whom an injured party may sue, we give the doctrine a very narrow construction. *Downing, supra.* The burden of pleading and proving an affirmative defense, such as charitable immunity, is on the party asserting it. *Id.* An entity's status as a nonprofit organization is but one of eight factors to be considered in determining whether it is entitled to charitable immunity. To determine whether an organization is entitled to charitable immunity, courts consider the following factors:

(1) whether the organization's charter limits it to charitable or eleemosynary purposes; (2) whether the organization's charter contains a "not-for-profit" limitation; (3) whether the organization's goal is to break even; (4) whether the organization earned a profit; (5) whether any profit or surplus must be used for charitable or eleemosynary purposes; (6) whether the organization depends on contributions and donations for its existence; (7) whether the organization provides its services free of charge to those unable to pay; and (8) whether the directors and officers receive compensation.

*Downing,* 2010 Ark. 175, at 9, 369 S.W.3d at 14. These factors are illustrative, not exhaustive, and no single factor is dispositive of charitable status. *Id.* at 10, 369 S.W.3d at 14–15.

The supreme court has described the appellate court's inquiry into charitable-immunity status, on appeal from a summary judgment, as follows: "While there may be fact issues involved, they are not matters of disputed fact. Rather, they are differing legal interpretations of undisputed facts. In such cases, an appellate court should grant summary judgment where reasonable persons would not reach different conclusions based upon those undis-

puted facts." *George*, 337 Ark. at 213, 987 S.W.2d at 713. As explained below, this case is one in which reasonable, fair-minded persons could reach different conclusions based upon the undisputed facts.

There is no dispute that AEO's articles of incorporation included the necessary statutory language for a nonprofit and charitable entity and, as admitted by Walsh, it does not depend on contributions or donations for its existence; most of its revenue comes from Medicare and Medicaid programs, with the balance from third-party payors and private patients. Although appellant argues that AEO's purported "free care" is simply "bad debt" and that very little, if any, care is given free of charge to indigents, this factor is not particularly important in light of the fact that Medicare and Medicaid play such significant roles in funding nursing-home care. *See Jackson v. Sparks Reg'l Med. Ctr.*, 375 Ark. 533, 294 S.W.3d 1 (2009). Additionally, the directors of AEO receive only $500 for attending each board meeting. *See id.*

In this case, the third, fourth, and fifth factors are clearly the most relevant. Appellant contends that AEO's goal was not to break even but to make a healthy profit, which was not used for charitable purposes, and offered evidence of AEO's net income and retained earnings during the relevant time period. It is true that the existence of profits and retained surplus are not necessarily determinative of charitable status, *see Anglin, supra; George, supra;* however, what *is* significant is AEO's payments to HC Staffing, HC Financial, and especially the owners of the leased facilities, which AEO characterizes as nothing but the reasonable expenses of

doing business. Appellant asserts that the earnings are actually being siphoned off, in the guise of expenses, to make it appear as if AEO has much less of a profit than it actually does, and that a question of fact remains to be tried as to whether AEO was created, not as a genuine charitable entity, but as one designed to keep substantial profits flowing to the investors without purchasing liability insurance. Her argument includes the principles underlying the "piercing-the-corporate-veil" doctrine, which provides that, in special circumstances, a court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party. *K.C. Props. of Nw. Ark., Inc. v. Lowell Inv. Partners, LLC*, 373 Ark. 14, 280 S.W.3d 1 (2008).[1] The issue of whether the corporate entity has been abused is a question for the trier of fact. *Id.* AEO responds that it entered into leases with the owners of the facilities in arms-length transactions, with monthly lease payments commensurate with market rates, and that appellant offered no evidence that those payments or its other expenses were unreasonable, exorbitant, or above market rate.

In resolving this issue, however, it is important to keep in mind that AEO, not appellant, bore the burden of establishing its right to summary judgment; that the charitable-immunity doctrine is to be narrowly construed; and that the pivotal issue in this case is whether the charitable-entity form has been abused. AEO convinced the trial court that, as a matter of law, its monthly expenses were reasonable and that the corporate entities and expenses were not intentionally structured as a way to funnel profits to the investors without

---

1. *See also Advocat, Inc. v. Sauer*, 353 Ark. 29, 51–52, 111 S.W.3d 346, 358–59 (2003), *cert. denied*, 540 U.S. 1012, 124 S.Ct. 532, 157 L.Ed.2d 424 (2003), where there was clear testimony by Advocat's former chief financial officer that a parent corporation and two subsidiaries were operated as one business.

buying liability insurance. Thus, in deciding this issue on appeal from a summary judgment, we must determine if there is a question of fact as to whether these expenses were reasonable; however, it has long been held that whether something is reasonable is a question of fact. *See Ford Motor Credit Co. v. Ellison,* 334 Ark. 357, 974 S.W.2d 464 (1998); *Crum v. Craig,* 2010 Ark. App. 531, 379 S.W.3d 71; *Mountain Pure, L.L.C. v. Affiliated Foods Sw., Inc.,* 96 Ark.App. 346, 241 S.W.3d 774 (2006). Additionally, whether the charitable form has been abused is a question of fact, *see K.C. Props., supra,* and summary judgment is improper when there are genuine issues of material fact as to a party's intent. *Mercy Health Sys., supra.*

We hold that genuine issues of material fact remain to be tried as to whether AEO is, in fact, a nonprofit, charitable organization. Technically, its originators took the necessary steps to create one on paper. The proof offered by appellant, however, revealed that the primary impetus for AEO's creation was to enable the nursing homes to continue to operate profitably without purchasing liability insurance; that the creation of AEO did not change the actual operation of the nursing homes; and that, whether the money generated by the nursing homes is labeled "reasonable expenses" or "profits," it continued to flow in the same direction as it did before. We also find that the trial court's reliance on *George, supra,* was misplaced. In that case, the hospital demonstrated that its profit margin was between "4% to 5%, far below that of for-profit hospitals which typically seek profit margins in the 15% to 20% range." 337 Ark. at 213, 987 S.W.2d at 713. Also, the hospital's use of its

surplus was consistent with, and in furtherance of, its overall charitable purpose—"to provide health care to all who need it." 337 Ark. at 213–14, 987 S.W.2d at 714. Neither fact was established in the case at bar. We offer no opinion as to whether AEO is a genuine charitable organization or merely a device for maximizing profits for the investors by evading the need to purchase liability insurance; that question is for the trier of fact to determine. Accordingly, we reverse and remand the summary judgment as to AEO.

■ In her next point, appellant argues that the trial court erred in granting summary judgment to Threlkeld because, as administrator of the nursing home, he was not required to provide direct care to Ms. Watkins in order to owe her a duty, and that certain federal and state statutes and regulations imposed a duty of care upon him. *See* Ark.Code Ann. §§ 20–10–1201 to –1209 (Repl.2005); Ark.Code Ann. § 20–10–402 (Repl.2005); Regulation 301.2 of Arkansas's Long Term Care Rules and Regulations for Nursing Homes; and 42 C.F.R. § 483.75.[2] There is no question that in Arkansas, the violation of state and federal statutes or regulations may be considered to be evidence of negligence. *Jackson v. Cadillac Cowboy, Inc.,* 337 Ark. 24, 986 S.W.2d 410 (1999); *Franco v. Bunyard,* 261 Ark. 144, 547 S.W.2d 91 (1977), *cert. denied,* 434 U.S. 835, 98 S.Ct. 123, 54 L.Ed.2d 96 (1977); *see also* Restatement (Second) of Torts, § 286 (1965).[3] In this case, however, we need not determine what duty Threlkeld owed Ms. Watkins because appellant failed to demonstrate proximate cause.

2. The Arkansas Supreme Court recently held that 42 C.F.R. § 483.75(d) does not create a duty in tort. *Bedell v. Williams,* 2012 Ark. 75, 386 S.W.3d 493.

3. Courts have tended to adopt administrative regulations as the standard of conduct less frequently than statutory enactments. 57A Am.Jur.2d *Negligence* § 744 (1989).

■ The essential elements of a cause of action for negligence are that the plaintiff show a duty owed and a duty breached, and that the defendant's negligence was a proximate cause of the plaintiff's damages. *Scott v. Cent. Ark. Nursing Ctrs., Inc.,* 101 Ark.App. 424, 278 S.W.3d 587 (2008). Proximate cause is defined, for negligence purposes, as that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred. *Id.* Proximate cause is generally a question of fact, unless the evidence is such that reasonable minds cannot differ. *Phillippy v. ANB Fin. Servs., LLC,* 2011 Ark. App. 639, 386 S.W.3d 553. An individual employed by a corporation, or officers and directors of corporations, may be personally liable to the extent that their tortious acts resulted in harm to a third party; if they were personally involved in the events surrounding an injury, they may be sued. *Bayird v. Floyd,* 2009 Ark. 455, 344 S.W.3d 80. Shareholders and employees of corporations may be liable for their own acts and conduct. *Scott,* 101 Ark. App. 424, 278 S.W.3d 587. In this case, however, appellant offered no evidence of how Threlkeld breached his duty of care, even if it was established, to Ms. Watkins and no evidence that a breach proximately caused injury to her. We therefore affirm the summary judgment entered in his favor.

■ In her next point, appellant argues that the summary judgments granted to HC Financial and Walsh should be reversed. As with Threlkeld, however, appellant failed to produce any evidence that Walsh or HC Financial's actions proximately caused Ms. Watkins's injuries. For that reason, we affirm the summary judgments awarded to them.

■ In her last point, appellant asks us to reverse the trial court's order concerning ex parte communication with current and former employees. She asks that she be permitted to contact, on an ex parte basis, current and former employees of the corporate defendants, as set forth in Arkansas Rule of Professional Conduct 4.2 (2011). She points out that, when the Arkansas Supreme Court adopted the latest version of the Model Rules of Professional Conduct in 2005, it adopted the commentary that interpreted that rule as no longer prohibiting communications with a person whose statement may constitute an admission. *See Paris v. Union Pac. R.R. Co.,* 450 F.Supp.2d 913 (E.D.Ark. 2006). AEO responds that it is apparent from the face of the pleadings that appellant should not have been permitted any ex parte communication with its employees because appellant alleged that appellees "had vicarious liability for the acts and omissions of all persons or entities under their control...."

Rule 4.2 of the Arkansas Rules of Professional Conduct (2011) provides:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law.

Comment 7 states:

In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the

organization's lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4.

██ The trial court has wide discretion in matters pertaining to discovery, and we will not reverse its decision in such matters absent an abuse of discretion. *Lancaster v. Red Robin Int'l, Inc.*, 2011 Ark. App. 706, 386 S.W.3d 662. In light of appellant's broad allegations about appellees' vicarious liability in the complaint, we cannot say that the trial court abused its discretion in this ruling.

Affirmed in part; reversed and remanded in part.

WYNNE and GLOVER, JJ., agree.