2012 Ark. App. 584

**Cynthia SMITH and Delois Muldrew, as Co–Special Administrators of the Estate of Bettye Hickman, Deceased, and on Behalf of the Wrongful Death Beneficiaries of Bettye Hickman, Appellants**

v.

**HEATHER MANOR CARE CENTER, INC. d/b/a Heather Manor Nursing and Rehabilitation Center; Central Arkansas Nursing Centers, Inc.; Nursing Consultants, Inc.; and Michael Morton, Appellees.**

No. CA 12–5.

Court of Appeals of Arkansas.

Oct. 24, 2012.

Rehearing Denied Dec. 5, 2012.

David A. Hodges, Little Rock, and Ludwig Law Firm, by: Gene Ludwig, for appellants.

Hardin, Jesson & Terry, PLC, Fort Smith, by: Rex M. Terry, Kirkman T. Dougherty, and Stephanie I. Randall, for appellees.

ROBERT J. GLADWIN, Judge.

This appeal is brought from the grant of appellees' motions for directed verdicts and the denial of appellants' challenge based on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the striking of three African–American members of the jury venire by appellees. We affirm.

Bettye Hickman died while a resident of a nursing home in June 2009. Two of Hickman's daughters, appellants Cynthia Smith and Delois Muldrew, are the co-administrators of Hickman's estate. In January 2010, they brought suit against the nursing home, two related entities that provided support services to the nursing home, and the owner of the three companies, respectively, appellees Heather Manor Care Center, Inc., d/b/a Heather Manor Nursing and Rehabilitation Center (Heather Manor); Central Arkansas Nursing Centers, Inc. (CANC); Nursing Consul-

tants, Inc. (NCI); and Michael Morton.[1] The complaint alleged the following causes of action against all defendants: medical malpractice; ordinary negligence; civil liability for felony neglect; premises liability; res ipsa loquitur; breach of informed consent; breach of fiduciary duty; breach of contract; violation of the Arkansas Deceptive Trade Practices Act; and a wrongful-death and survival claim. In addition, the administrators asserted a claim for violation of the Arkansas Long Term Care Statute, Ark.Code Ann. § 20–10–1201 et seq., against Heather Manor.[2] The administrators sought both compensatory and punitive damages, costs, and all other relief. The appellees answered, denying most of the allegations and pleading affirmatively the statute of limitations, comparative negligence, act of God, and the negligence of third parties.

Prior to trial, appellees moved to dismiss the complaint, or, for summary judgment. In the brief accompanying the motion, appellees argued that the cause of action on the violation of resident's rights applied only to the licensee, in this case, Heather Manor. They also argued that the claims for negligence, medical malpractice, civil liability for felony neglect of an endangered person, res ipsa loquitur, breach of informed consent, breach of contract, and violation of the Deceptive Trade Practices Act were all subsumed in the claim for medical |₃malpractice, and that the claims for premises liability and breach of fiduciary duty should also be dismissed. The circuit court granted the motions in part and dismissed the administrators' claims based on res ipsa loquitur and violation of the Deceptive Trade Practices Act. The

court denied the motion as to the other causes of action.

The case proceeded to a jury trial lasting several days. At the close of the administrators' case, the circuit court granted the motions for directed verdicts on all counts on behalf of CANC, NCI, and Morton. Heather Manor made similar motions on each cause of action. The administrators conceded the causes of action based on premises liability and civil liability for felony neglect, and the circuit court granted the motion as to the claims for informed consent, breach of fiduciary duty, breach of contract, and ordinary negligence. The court denied the motion as to the claims for medical malpractice and wrongful death, as well as the claim for punitive damages. The circuit court initially denied the motion as to the resident's rights claim when made at the close of the administrators' case, but granted it when renewed at the close of all of the evidence. The case was submitted to the jury on the medical malpractice, wrongful-death, and punitive-damages claims. Nine jurors found that the administrators had not proved by a preponderance of the evidence that there was medical negligence on the part of Heather Manor that was a proximate cause of damage to the decedent. This appeal timely followed.

The administrators argue four points on appeal: (1) the circuit court erred in granting a directed verdict in favor of Heather Manor on their resident's rights claim under Ark.Code Ann. § 20–10–201; (2) the circuit court erred in granting a directed verdict in favor of Heather |₄Manor on their claims for breach of contract, ordi-

---

1. At the time the complaint was filed, Cynthia Smith was the sole administrator of Hickman's estate. Delois Muldrew was later appointed as co-administrator because of Smith's health problems. After Muldrew's appointment, the circuit court entered an or-

der substituting Smith and Muldrew as co-administrators as plaintiffs.

2. In some instances, this cause of action is referred to as the resident's rights claim.

nary negligence, and breach of fiduciary duty; (3) the circuit court erred in denying their *Batson* challenge to the striking of three African–American jurors; and (4) the circuit court erred in granting a directed verdict in favor of CANC, NCI, and Morton.

▮ In determining whether a directed verdict should have been granted, we review the evidence in the light most favorable to the party against whom the verdict is sought and give it its highest probative value, taking into account all reasonable inferences deducible from it. *Scott v. Cent. Ark. Nursing Ctrs., Inc.*, 101 Ark.App. 424, 278 S.W.3d 587 (2008). A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Id.* Stated another way, a motion for a directed verdict should be granted only when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.* Substantial evidence is evidence of sufficient force and character to induce the mind of the fact-finder past speculation and conjecture. *Sparks Reg'l Med. Ctr. v. Smith*, 63 Ark. App. 131, 976 S.W.2d 396 (1998).

The administrators do not challenge the sufficiency of the evidence to support the jury verdict in favor of Heather Manor on the medical-malpractice and wrongful-death claims. During the various motions for directed verdicts, the parties argued issues that they had briefed as part of Heather Manor's motion for summary judgment based on its assertion that the causes of action were subsumed into the medical-malpractice claim. The circuit court allowed the parties to incorporate these arguments into their arguments on the motions for directed verdicts.

In making the motion for directed verdict at the close of the administrators' case, Heather Manor argued that the only testimony concerning the resident's rights claim was expert testimony regarding the professional standards of care at nursing homes. It also argued that there was no testimony as to the rights available under the statute and whether those rights had been violated. The administrators asserted that the evidence in support of their malpractice claim would also support a resident's rights claim. The court ultimately granted the motion without specifying the basis for the ruling, noting that it had almost granted the motion at the close of the administrators' case. The court said that it was convinced that it should be granted at that time.

▮ Because the court did not specify its basis, we address both possible grounds. Although the Arkansas Supreme Court has not expressly considered whether a resident's rights claim is subsumed into a medical-malpractice claim, it has referred to a resident's rights claim as a statutory claim that is separate and distinct from any negligence claim.[3] *Koch v. Northport Health Servs. of Ark., LLC*, 361 Ark. 192, 202, 205 S.W.3d 754, 762 (2005). We cannot say that the administrators' resident's rights claim was subsumed into the medical-malpractice claim. Therefore, the circuit court could not properly grant a directed verdict on that basis in favor of Heather Manor. However, a directed verdict in favor of Heather Manor would be proper if the administrators failed to sub-

---

3. In *Health Facilities Management Corp. v. Hughes*, 365 Ark. 237, 227 S.W.3d 910 (2006), the court held that a resident's rights claim can only be maintained against the licensee, in this case, Heather Manor.

mit sufficient evidence to support their claim.

█ █ The Resident's Rights Act provides the following regarding civil enforcement:

(a)(1) Any resident who is injured by a deprivation or infringement of his or her rights as specified in this subchapter may bring a cause of action against any licensee responsible for the deprivation or infringement.

(2) The action may be brought by the resident or his or her guardian or by the personal representative of the estate of a deceased resident.

(3) The action may be brought in any court of competent jurisdiction in the county in which the injury occurred or where the licensee is located to enforce such rights and to recover actual and punitive damages.

(4) The resident may seek to recover actual damages when there is a finding that an employee of the long-term care facility failed to do something which a reasonably careful person would do or did something which a reasonable person would not do under circumstances similar to those shown by the evidence in the case, which caused an injury due to an infringement or a deprivation of the resident's rights.

(5) No separate award of attorney's fees may be made by the court.

Ark.Code Ann. § 2–10–1209(a) (Repl.2005). Therefore, there first must be a finding that an employee erred in failing to do something or erred by doing something. *See Bedell v. Williams*, 2012 Ark. 75, 386 S.W.3d 493. Secondly, that error must have caused injury as a result of an infringement or deprivation of the resident's rights. *Id. Bedell* thus makes it clear that there is a causation element in a resident's rights claim.

█ The administrators point to evidence that, according to them, establishes violations of the statute; however, they do not point to any evidence linking those alleged violations to Hickman's injuries or death. Proximate causation is an essential element for a cause of action under the resident's rights statute. *Bedell, supra.* The administrators devote most of their argument to whether the resident's rights claim was subsumed into the medical malpractice claim. They make only conclusory assertions that they proffered sufficient evidence. They do not develop an argument or cite any evidence that they contend establishes causation. It is not the duty of this court to research or develop arguments for an appellant on appeal. *See Martin v. Pierce*, 370 Ark. 53, 63–64, 257 S.W.3d 82, 90 (2007). Indeed, our courts have often said that failure to develop an argument precludes review of the issue on appeal. *See, e.g., Davis v. State*, 375 Ark. 368, 375, 291 S.W.3d 164, 169 (2009). We cannot say that the circuit court erred in granting a directed verdict on the resident's rights claim.

The administrators next argue that the circuit court erred in granting Heather Manor's motions for directed verdict on their claims for ordinary negligence, breach of contract, and breach of fiduciary duty on the basis that those claims were subsumed into the medical malpractice claim.

While it is true that, in making the motions for directed verdicts, Heather Manor argued that these claims were subsumed into the medical-malpractice claim, it also argued that there was insufficient evidence to send each claim to the jury. The circuit court in each instance ruled on the basis that there was insufficient evidence to proceed, not that the claims were subsumed into the malpractice claim. Indeed, the court did not address whether

the claims were subsumed. Although the administrators correctly cite examples of where each type of claim has been considered separate from a medical-malpractice claim, they do not develop an argument that cites to and explains why there was sufficient evidence for the claims to go forward. We summarily affirm on this point because the administrators fail to develop a convincing argument as to the stated basis for the circuit court's ruling. *Davis, supra.*

In the administrators' third point, they complain that Heather Manor struck three African–American members of the venire, Ruthilene Edwards, Sheronda Dean, and Demechia Rowe, in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

During voir dire, Rowe stated that her mother knew one of the witnesses, Helen Bradford, but stated that she did not socialize with Bradford. Rowe also stated that she worked with Kayla Wingfield, another of Hickman's daughters and a potential witness, at a nursing home in Texarkana and had previously worked at other nursing homes. She said that there was nothing in her employment experiences that would cause her to have any concern being a juror in a case involving a nursing home. Dean was not asked any specific questions.

After counsel for the administrators explained the racial composition of the venire,[4] the court asked counsel for Heather Manor to explain his strikes. Counsel explained that Rowe knew two potential witnesses and that she was sitting in the front row talking with members of Hickman's family prior to jury selection. Counsel continued, saying that Edwards was struck because he did not want anyone who had

worked as a CNA on the jury panel. He also said that he perceived "a somewhat derisive snort" when he asked Edwards if all nursing homes were understaffed. As for Dean, counsel explained that she seemed more receptive and responsive to questions put to the panel by the administrators' counsel than to his own questions. He also stated that she rolled her eyes a couple of times when he was asking questions and that she appeared very reluctant. He noted that Dean was late for jury duty, in part because she was a single mother. The circuit court, without explanation, denied the *Batson* challenge.

Our supreme court has previously stated our standard of review for challenges under *Batson:* "This court will reverse a circuit court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. We further accord some measure of deference to the circuit court, because it is in a superior position to make determinations of juror credibility." *Travis v. State,* 371 Ark. 621, 628, 269 S.W.3d 341, 346 (2007).

Under *Batson* and its progeny, a party may not use peremptory strikes to exclude jurors solely on the basis of race. *Ratliff v. State,* 359 Ark. 479, 199 S.W.3d 79 (2004). In determining whether such a violation has occurred, a three-step analysis is applied. *Stokes v. State,* 359 Ark. 94, 194 S.W.3d 762 (2004). The first step requires the opponent of the peremptory strike to present facts that show a prima facie case of purposeful discrimination. *Id.* This first step is accomplished by showing the following: (a) the opponent of the strike shows that the juror is a member of an identifiable racial group; (b) the

---

4. Of the eighteen-member jury pool, six members were African American and twelve were not African American.

strike is part of a jury-selection process or pattern designed to discriminate; and (c) the strike was used to exclude jurors because of their race. *Id.* (citing *MacKintrush v. State,* 334 Ark. 390, 978 S.W.2d 293 (1998)).

Once a prima-facie case of discrimination has been shown, the process moves to the second step, wherein the burden of producing a racially neutral explanation shifts to the proponent of the strike. *Id.* This explanation, according to *Batson,* must be more than a mere denial of discrimination or an assertion that a shared race would render the challenged juror partial to the one opposing the challenge. *Weston v. State,* 366 Ark. 265, 234 S.W.3d 848 (2006). Under *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam), this explanation need not be persuasive or even plausible. Indeed, it may be silly or superstitious. The reason will be deemed race neutral "[u]nless a discriminatory intent is inherent in the [proponent's] explanation." *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. But, according to *Purkett,* the circuit court must not end the *Batson* inquiry at this stage, and, indeed, it is error to do so.

If a race-neutral explanation is given, the inquiry proceeds to the third step, in which the circuit court must decide whether the opponent of the strike has proved purposeful discrimination. *Stokes, supra.* We will reverse a circuit court's findings on a *Batson* objection when the circuit court's decision was clearly against the preponderance of the evidence. *Travis, supra.*

The administrators suggest that counsel's observations of Sheronda Dean's demeanor are insufficient to support a strike unless corroborated for the record by opposing counsel or the court. However, the fact that the observations of a challenging party are unconfirmed may affect the circuit court's determination of the persuasiveness of an explanation, but confirmation is not necessary for a party's observation of a potential juror's demeanor to form the basis of a race-neutral explanation for a peremptory challenge. *State v. Robinson,* 272 Neb. 582, 724 N.W.2d 35 (2006). Also, this court has held that explanations related to demeanor were race neutral and could survive a *Batson* challenge. *See Riley v. State,* 2009 Ark. App. 613, 343 S.W.3d 327; *Hugh Chalmers Chevrolet v. Lang,* 55 Ark.App. 26, 928 S.W.2d 808 (1996).

The administrators argue that the strike of Ruthilene Edwards was discriminatory because Heather Manor did not strike another nursing-home employee, Tammy Wellman. Wellman was the director of nursing at a different home, not the same job or circumstances as Edwards. Also, Wellman was eventually excused from the jury, apparently for cause. The administrators do acknowledge that there were differences in responsibility for another juror not struck who worked in a nursing home and Edwards, but do not differentiate between the duties of Wellman and Edwards.

Turning to the strike of Demechia Rowe, we note that another African–American juror, Lola Morrison, said that she knew the family. Morrison was not struck, nor was she observed sitting and talking with one of the parties immediately prior to voir dire. This serves as evidence that the strike of Rowe was not racially motivated. Rowe also admitted to talking with Wingfield about working at the same facility.

The explanations that were given were race neutral in that they were not peculiar to any race, and they were suffi-

cient to satisfy *Batson.* Moreover, three African Americans were seated on the jury. That, in itself, can answer the charge of purposeful discrimination. *See Ratliff, supra* (stating that the best answer the State can have to a charge of discrimination is to point to a jury that has black members). Based on all the circumstances before the circuit court at the *Batson* hearing, we cannot say that the court's refusal to find a *Batson* violation was clearly erroneous or clearly against the preponderance of the evidence.

Finally, in the administrators' fourth point, they argue that the circuit court erred in granting directed verdicts in favor of CANC, NCI, and Michael Morton.

As noted earlier, the resident's rights claim cannot be maintained against CANC, NCI, or Morton. *Health Facilities Mgmt. Corp., supra.* Also, neither CANC, NCI, nor that Morton had contracts directly with Hickman, thereby precluding a cause of action for breach of contract. As to the remaining causes of actions, we recently considered the same arguments against the same defendants in *Scott v. Central Arkansas Nursing Centers, Inc., supra.* In *Scott,* the plaintiff sued the nursing home where the plaintiffs mother had lived during the last years of her life, CANC, NCI, and Morton. Directed verdicts were granted to these defendants. We reversed the directed verdict in favor of NCI, but affirmed as to CANC and Morton.

Citing *Advocat, Inc. v. Sauer,* 353 Ark. 29, 111 S.W.3d 346 (2003), the administrators argue that CANC can be held liable because Morton operated Heather Manor, CANC, and NCI as one business. However, *Sauer* is distinguishable from the present case because there was clear testimony in that case, including testimony from a former chief financial officer, that all three entities in that case were operated as essentially one company. 353 Ark. at 42, 111 S.W.3d at 352. This court also noted this testimony in *Scott,* 101 Ark.App. at 436, 278 S.W.3d at 596. There is no such testimony in the present case. The testimony was that CANC was under contract to provide billing and accounting services to Heather Manor, and the administrators concede that these services do not directly deal with patient care. As we said in *Scott,* "[w]hile this fact establishes an affiliation among the entities in this case, it does not constitute substantial evidence that CANC was negligent or that CANC contributed to Mrs. Mince's injuries or death." 101 Ark.App. at 435, 278 S.W.3d at 595. The same holds true in the present case.

There is also no question that an individual employed by a corporation, or officers and directors of corporations, may be personally liable if they were personally involved in the events surrounding an injury. *See Bedell v. Williams, supra; Bayird v. Floyd,* 2009 Ark. 455, 344 S.W.3d 80. In this case, however, the administrators conceded that Michael Morton was not directly involved in Hickman's care. Instead, the administrators assert that Morton can still be held liable because he played a role in the management of Heather Manor. They also argue that Morton can be held vicariously liable for the acts and omissions of Heather Manor, CANC, and NCI. The administrators rely on testimony that Morton could fire Wincy Hursh, the director of operations for NCI, if he so desired or have Hursh fire the administrator at Heather Manor.

However, Morton testified that his job as the governing body of Heather Manor is to provide policies and procedures and to have a licensed administrator implement those policies. He also said that it was NCI's function to make sure that the policies and procedures were followed by Heather Manor's administrator. The ad-

ministrators also cite Morton's testimony that Heather Manor's administrator occasionally called him if there was a problem as evidence of Morton's involvement and control. However, this statement is taken out of context and does not support the argument. Morton testified that the problem referred to was that some people were admitting their parents to nursing homes under the false assertion that the parents would qualify for Medicaid. Morton tried to remedy that problem by having patients pay in advance while attempting to obtain certification as eligible for Medicaid. He said that Heather Manor's administrator called to advise him that Heather Manor was losing patients to another nursing home as a result of the policy. This is exactly the type of involvement that Morton as the governing body is supposed to have, i.e., make policy for the facility. *See Scott*, 101 Ark.App. at 435–36, 278 S.W.3d at 596. Moreover, there is no evidence cited by the administrators showing that Morton's involvement included setting staffing levels, training, or supervision at Heather Manor or that his actions proximately caused the decedent's injuries or death. Because of this, the circuit court correctly granted the motion for directed verdict in favor of Morton. *Bayird, supra.*

In *Scott*, we reversed a directed verdict in favor of NCI because the appellant in that case had presented substantial evidence from which a jury could reasonably have concluded that NCI was negligent and that its negligence was a proximate cause of the plaintiff's decedent's injuries and death. The *Scott* court said that it was "plain from the proof that NCI was directly involved in the provision of care at [the nursing home] during the time that [the decedent's] condition began to deteriorate." 101 Ark.App. at 437, 278 S.W.3d at 597. This court then detailed that evidence and

concluded that the directed verdict in favor of NCI must be reversed. This evidence included testimony that the nursing home was deemed one of the worst facilities in the state; that there were state surveys showing the need to improve staffing; that NCI was involved in trying to improve staffing; that an employee of NCI served briefly as director of nursing; and that NCI made recommendations concerning residents'

In the present case, there is no such comparable testimony. The evidence the administrators rely upon shows that NCI is available for consultation and to provide training regarding various issues. The administrators do not explain how this consultation and training by NCI establishes that NCI was negligent or otherwise contributed to the injuries suffered by Hickman. We cannot say that the circuit court erred in granting a directed verdict in favor of NCI.

Affirmed.

GRUBER and GLOVER, JJ., agree.