Cite as 2025 Ark. App. 540

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-24-145

| | |
|---|---|
| WYNNE-ARK., INC., D/B/A KELLEY'S RESTAURANT<br><br>APPELLANT<br><br>V.<br><br>ASPHALT PRODUCERS, LLC; AND RICHARD BAUGHN CONSTRUCTION, INC.<br><br>APPELLEES | Opinion Delivered November 12, 2025<br><br>APPEAL FROM THE CROSS COUNTY CIRCUIT COURT<br>[NO. 19CV-14-46]<br><br>HONORABLE CHRISTOPHER W. MORLEDGE, JUDGE<br><br>REVERSED AND REMANDED |

**BART F. VIRDEN, Judge**

This appeal stems from the Cross County Circuit Court's decision granting Richard Baughn Construction's (RBC's) directed-verdict motion and dismissing with prejudice the negligence claim and claim for damages filed by Wynne-Ark., Inc., d/b/a Kelley's Restaurant (Kelley's). We reverse and remand.

## I. *Relevant Facts*

In June 2014, Kelley's filed a complaint in the circuit court seeking damages against Asphalt Producers, LLC (API), and its subcontractor, RBC, related to an Arkansas Highway Transportation Department (AHTD) construction project on Highway 1 and Highway 64. In the complaint, Kelley's alleged the restaurant suffered monetary damages arising from the defendants' negligent performance of the contract.

This is the third time some aspect of this case has been before this court. In 2017, RBC moved to compel the disclosure of the confidential settlement agreement between API and Kelley's.[1] The circuit court granted the motion, and Kelley's appealed the decision. We reversed and remanded the case to the circuit court. *See Wynne-Ark., Inc. v. Richard Baughn Constr.*, 2017 Ark. App. 685, 545 S.W.3d 771. On remand, following a hearing, the court ordered disclosure of the confidential settlement agreement. Kelley's appealed, and this court reversed the circuit court's decision. *See Wynne-Ark., Inc. v. Richard Baughn Constr.*, 2020 Ark. App. 140, 597 S.W.3d 114.

A trial was held on November 28, 2023. Kelley's manager, Shannon Kelley, testified first. He explained that Kelley's was a buffet-style and a la carte restaurant serving breakfast, lunch, and dinner. Through his testimony, the "Kelley's Restaurant Summary Reports" from September 2011 to December 2014, the period of construction, were introduced to evidence.[2] Shannon explained that the summary reports are a compilation of the "daily workup sheets" that represent restaurant sales by number of meals sold. Shannon explained that it was important to measure by plates sold because food costs fluctuated, and this method accurately showed whether Kelley's was gaining or losing business. From 2007 to 2010, prior to construction, 14,530 breakfast meals; 12,264 lunch meals; and 12,994 dinner meals were purchased. Shannon testified that the 2011 summary report shows that the meal

---

[1]API was dismissed from the lawsuit pursuant to the settlement.

[2]The exact date the construction began is disputed by the parties. RBC asserts that construction began in May 2012.

count decreased by 1,040 for breakfast and increased 541 meals for lunch and 502 meals for dinner. In 2012, the summary report showed a larger decrease. Breakfast sales fell by 2,811; lunch by 18,879; and dinner by 16,839. In 2013, breakfast sales were down 3,954; lunch by 24,769; and dinner by 22,613. In 2014, breakfast sales decreased by 8,807 meals; lunch by 25,401; and dinner 17,816. Shannon testified that overall, from 2011 to 2014, revenue from sales decreased by $886,905. A graph was introduced, which provided a visual reference for the above testimony. Shannon recalled that in 2002, a tornado damaged the restaurant, and Kelley's closed for reconstruction; however, other than that, Kelley's had never suffered an interruption of business. Shannon explained that since he became the manager in 1988, there had been an increase in sales nearly every year until highway construction began. He testified that before construction, there may have been a small gain one year or maybe even a little loss, but "we would always keep growing in sales." Shannon stated that Kelley's had owned the restaurant building without debt, but after the highway-construction project began, due to business loss, then owner Stan Kelley had to borrow $350,000 from the bank to keep the restaurant going and offered the building as collateral, which Stan repaid. Shannon described the conditions that led to the loss of business, explaining that prior to construction, there were six entrances to the parking lot. When construction began, the asphalt and concrete entrances were either shut down or moved and replaced with gravel and dirt that became "mud holes" when it rained. He explained that the driveways leading into the parking lot were torn up for three out of the four years of construction, and there were cones and barrels blocking the entrances. He recalled that "we literally had one lady

drag her bumper off of her car coming into the parking lot, getting stuck in the—in the dirt, and I guess gravel, debris, whatever you want to call it—mud that was out there trying to turn into these driveways as far as that goes." Customers complained "constantly" about the condition of the driveways. Shannon testified that "[a]nybody with a camper trailer or gooseneck . . . could not access the parking lot without running into cones or barrels or "tearing up a bunch of stuff." The restaurant heavily relied on people stopping to eat as they went to and from the nearby auction house and recreational areas, and without an accessible driveway, those customers stopped coming to Kelley's. Shannon testified that the traffic was frequently severely backed up , which also hurt business.  Shannon explained that about once a week, he complained to the AHTD employees on the site and contended that there were more complaints than the three that the AHTD's record showed. Shannon testified that RBC parked construction equipment in Kelley's parking lot without permission, and the construction project took much longer than the projected 170 days. Additionally, RBC had permission to dump "good field dirt" containing only a small amount of construction materials on the acreage behind the restaurant; however, RBC dumped a large amount of busted concrete and rebar from the bridge reconstruction, which cost $10,000 to have removed. In hauling these materials, RBC's trucks damaged Kelley's parking lot, causing holes and other wear-and-tear damage. Shannon explained there was another way onto the acreage that did not involve driving across the parking lot, but RBC cut across the parking lot anyway. He testified that "virtually the whole west side of the parking lot" had to be repaired or replaced for around $6,500 to $8,500.

Richard Baughn, the co-owner of RBC, testified next. He stated that his contract with the AHTD involved doing the excavation; dirt work; underground drainage; soil and cement stabilization; "grubbing" of trees; removing and disposing of curb and gutter, concrete, and approach slabs; and disposal of box culverts and headwalls.  They also did a portion of the maintenance of traffic, removing the bridge, and some concrete work. Baughn testified that according to his contract, RBC had a duty to maintain access for all the businesses along the construction route, and to fail to do that would constitute negligence. Baughn addressed the driveway access to Kelley's, explaining that closing off one access point to a business was not negligent if there was more than one driveway. Baughn recalled meeting with the AHTD regarding a change to a driveway that Shannon had requested, but he did not recall Shannon ever complaining. He also denied that the traffic was as bad as Shannon had described. Baughn testified that RBC had a "waste pit agreement" with Kelley's that allowed RBC to dump dirt and construction waste onto his property. Baughn explained that Shannon wanted the materials dumped on the property and never asked RBC to stop.

Don Pagan, Kelley's CPA, testified that he reviewed Kelley's tax returns and monthly statements for the construction period from 2011 through 2014. Pagan explained that in 2008, 2009, and 2010, Kelley's served 152,000, 152,000 and 149,000 meals, respectively. By 2013, Kelley's sales had declined 33 percent to 98,000 meals. Pagan testified that from September 2011 to May 2014, Kelley's lost $680,666 in revenue, with a gross-profit loss of $380,000. Pagan explained that because the restaurant business involves other expenses like building repairs and equipment repairs, utilities, and insurance, the plate count is the best

5

method to determine economic loss or gain. On cross-examination, Pagan admitted that there was a substantial mathematical error in his calculation of the average annual income from 2007 to 2011. He testified that he initially miscalculated that the restaurant's average net income for the preconstruction period was $81,423; however, he testified that after the mistake was corrected, on average, Kelley's lost $3,983 a year before construction began. On redirect, Pagan stood by his opinion that the decline in sales led to gross lost profits.

Matt Emberton was the AHTD construction division resident engineer for the second half of the construction project. Emberton testified that allowing access to businesses is one of the standard specifications of any AHTD project. He explained that contractors were obligated to minimize difficulty and inconvenience accessing the businesses but were not required to eliminate it. He recalled meeting with either Shannon or Stan to discuss a problem with access, and that "wings" were added to the driveway to make it easier to turn into the parking lot. Terry Evans, a civil engineer who worked on the construction project, testified that he was at the construction site every day, and Shannon never complained to him about access to Kelley's.

Several regular customers of Kelley's testified that business dropped off precipitously after the construction began. Brian Andrews owned the wrecker service business across the street from Kelley's and testified that some of Kelley's driveways were blocked and recalled that blocked entrances were a continuous problem for the landowners and business owners that lived along the construction route. When he ate at Kelley's during construction, he noticed that there were fewer customers, and he no longer had to wait for a table as he did

6

before the construction. Paul Hall worked at a nearby bank during construction and testified that "all of a sudden, the number of people that you saw dining just kept dwindling and dwindling." A former waitress, Lynn Ward, testified that during construction, the parking lot was "a nightmare" and that to enter the lot

> [w]e had to go down to in front of the trailer place ~ the trailer place and then several businesses, and then a motel, and then us to get into the parking lot. A lot of days, we tried to pull around and park out in the front, so customers would know that we were open because we didn't want to park around back like we normally done because it looked like we were closed because there was no customers. I remember sitting at the windows just looking out thinking man, this feels like a snow day because we just didn't have any customers at all.

Ward testified that the construction crew left the cones blocking Kelley's driveway even when they were not working. The motel owner next door to Kelley's testified that the motel entrance and Kelley's entrance were right next to each other, and both were blocked "most of the time."

RBC moved for a directed verdict, asking the court to dismiss all claims with prejudice. First, RBC contended that there was no substantial evidence of negligence. Specifically, RBC argued that there was no evidence that RBC did not comply with the AHTD's plans, specifications, and instructions and that Kelley's did not present evidence that access to the restaurant was denied. RBC contended that there was no evidence of damages "pertaining to the retirement and payment to the indebtedness of Kelley's Restaurant" and it was undisputed that the corporate entity's $350,000 loan debt was paid off; thus, Kelley's did not prove that the loan repayment is cognizable as a loss. RBC also argued that it was "entitled to acquired immunity under the authority of the *Rogers* case."

7

The court granted the directed verdict motion, ruling that

> the problem I have in this case is causation. There has been no proof whatsoever that Richard Baughn Construction had any causation to any events that occurred whatsoever. They were under the direct control of the primary contractor, API, and under the Arkansas Highway Transportation Department, which has immunity because of its special status in the State of Arkansas. But as far as proof as to causation of any particular fault of Defendant Richard Baughn Construction, the Court finds there is none. The Court further finds that the damages are speculative at best.

Kelley's asked the court to reconsider, arguing that there was evidence that RBC violated the AHTD specifications such that the issue should have gone to a jury. Kelley's also argued that Stan Kelley, who was Kelley's sole owner during construction, took out the $350,000 loan to keep Kelley's in business, and evidence of that loan and its repayment were proof of damages. Last, Kelley's contended that RBC was not entitled to acquired immunity because it negligently executed the contract. The court denied the request.

In the dismissal order, the circuit court found there was no substantial evidence that any act or omission of RBC proximately caused any of the damages at issue, and Kelley's evidence of damages was unduly speculative.

Kelley's timely filed a notice of appeal, and this appeal followed.

II. *Discussion*

A. Dismissal of Kelley's Negligence Claim

1. *Causation*

A motion for directed verdict should be granted only if there is no substantial evidence to support a jury verdict. *Smith v. Heather Manor Care Ctr., Inc.*, 2012 Ark. App. 584, 424 S.W.3d 368. Stated another way, a motion for a directed verdict should be granted only

when the evidence viewed is so insubstantial as to require the jury's verdict for the party to be set aside. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.* Substantial evidence is evidence of sufficient force and character to induce the mind of the fact-finder past speculation and conjecture. *Id.*

"To establish a prima facie case of negligence, the plaintiff must demonstrate that the defendant breached a standard of care, that damages were sustained, and that the defendant's actions were the proximate cause of those damages." *Barnett v. Cleghorn*, 2017 Ark. App. 641, at 6, 536 S.W.3d 147, 150. "Proximate cause" is defined as "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Id.* "Proximate causation is usually an issue for the jury to decide, and when there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury." *Id.* "Proximate causation becomes a question of law only if reasonable minds could not differ." *Id.* Negligence is "the failure to do something which a reasonably careful person would do." *Ambrus v. Russell Chevrolet Co.*, 327 Ark. 367, 370, 937 S.W.2d 183, 184 (1997).

Kelley's asserts that there was substantial evidence presented at the trial that would support a jury's verdict that RBC breached the standards set forth in the AHTD construction specifications, and in that breach, RBC proximately caused damage to the business. Specifically, Kelley's claims that RBC breached the AHTD construction project's

9

specifications, which proximately caused Kelley's decline in sales."[3] Kelley's presented evidence that the truck entrances to the parking lot were closed, making it impossible for vehicles hitched to boats or trailers to turn into the lot. The auction house a short distance from Kelley's and the regional recreational areas were consistent sources of customers for Kelley's, and the closure of the truck entrance made it impossible for those vehicles to safely enter Kelley's lot. There was evidence presented that the entrances were blocked by cones making it difficult to enter the lot, and witnesses testified that to get to Kelley's lot, they had to enter the lot of another business down the road and drive to Kelley's.

RBC claims that it adhered to the AHTD specification that contractors must maintain the access points for the safe and convenient use of the adjacent property and minimize difficulty entering the parking lot. RBC contends that Kelley's presented no evidence of negligence because Shannon and Pagan testified that they always had access to the parking lot and that the key "is to minimize, not eliminate difficulty and inconvenience." We disagree. Because there was evidence and testimony that it was dangerous and at times impossible to enter the driveways, a reasonable jury could find that a causal connection exists between RBC's negligence in adhering to the contract specifications and Kelley's lost profit. In other words, whether RBC complied with the contract specifications by providing safe

---

[3]Section 603.02(d) of the AHTD Standard Specifications requires that "[t]he contractor shall maintain access for the safe and convenient use of the adjacent property owners/occupants." *See* https://ardot.gov/wp-content/uploads/2020/10/Division-600.pdf.

and convenient alternative driveways or failed to comply with this specification is a question for a jury to decide.

RBC also argues that Kelley's financial records show that the restaurant lost more profits before and after the project than during it, and Kelley's closed in 2017, three years after RBC finished work; thus, there is no evidence that RBC was the cause of Kelley's downturn in business. RBC contends that Pagan's testimony and report regarding Kelley's income statements and tax returns, his mathematical errors in calculating lost profits, and Kelley's pattern of profit loss show that the construction was unrelated to the damage to the business. Contrastingly, Kelley's asserts that the testimony that the most accurate way to prove damages is by the decreasing plates-sold count and cites the need for the $350,000 loan to keep the restaurant open as proof of causation. It is the province of the jury to resolve conflicting testimony. *S. Constr., LLC v. Horton*, 2020 Ark. App. 361, 609 S.W.3d 16. This is also true for the conflict between Kelley's testimony that there were more complaints than those noted by the AHTD, and Emberton's and Evans's testimony that Shannon never complained. In light of the evidence presented and our standard of review, the directed verdict was granted in error, and the issue of damages should have been presented to the jury.

Accordingly, we hold that Kelley's presented substantial evidence such that a jury could have found that RBC negligently caused damage to Kelley's, and we reverse the circuit court's decision regarding proximate cause.

2. *Damages*

11

We now turn to Kelley's claim that the circuit court erred in finding that the evidence of damages was speculative. We agree, and we reverse and remand. To recover damages for lost profits, the claimant must present evidence that makes it reasonably certain that the profits would have been realized but for the wrongful act. *Greenway Equip., Inc. v. Johnson*, 2020 Ark. App. 336, 602 S.W.3d 142. Arkansas law does not require exactness in proving damages. *Agracat, Inc. v. AFS-NWA, LLC*, 2010 Ark. App. 458, 379 S.W.3d 64. If it is reasonably certain that some loss occurred, damages may be stated approximately, even when they are difficult to ascertain, as long as the evidence allows the fact-finder to reach a satisfactory conclusion. *Id.* Where the evidence is such that fair-minded persons might reach different conclusions, then a jury question is presented, and the directed verdict should be reversed. *Id.*

Kelley's contends that a fair-minded jury could find that the construction caused nonspeculative damages. Kelley's cites the evidence that the number of plates sold dropped significantly during construction, and witnesses testified that there were dramatically fewer customers during the period of construction. There was testimony that the owner of Kelley's at the time had to take out a $350,000 loan to keep the business afloat, and though Pagan admitted to significant math errors, he stood by his testimony that Kelley's lost profits during the construction.

RBC disagrees, claiming that the evidence shows that Kelley's lost more profits in the years before and after construction than it did during construction. RBC contends that Pagan's calculations were "riddled with basic math and accounting errors," and he could not

explain or tie Kelley's lost profits to RBC. RBC contends that the issue in this case is not whether Kelley's sustained losses but whether the losses were proximately caused by RBC's negligence or noncompliance.

In *Jim Halsey Co. v. Bonar*, 284 Ark. 461, 467, 683 S.W.2d 898, 903 (1985), the supreme court affirmed the circuit court's decision that the damages award was not based on speculation. In *Halsey*, celebrity Rick Nelson's booking agent realized that the singer/actor would not be performing at a benefit concert in Fort Smith that he was scheduled to attend, and the agent did not tell the local concert promoter. In part, the promoter asserted that damage to his reputation caused him to lose business and profits, and concert sponsors testified that they would not hire the promoter after this incident. Our supreme court recounted that the promoter testified that

> a promoter can expect to put on at least one concert a year. He then figured a reasonable income from that concert based on a formula which included the number of seats at the local stadium, a typical ticket price, and reasonable ticket sales based on an average vacancy rate. He subtracted concert expenses and arrived at a net yearly income for the promoter of $31,880.00.

284 Ark. at 467, 683 S.W.2d at 903.

Our supreme court held that the promoter offered sufficient proof that he would have realized a profit, and the amount of income the promoter would lose as a result of damage to his reputation, though stated approximately, was not based on speculation. The instant case is similar in that there was evidence of lost sales correlating to the time of construction, witnesses testified that there were drastically fewer customers, and there was

testimony that the owner had to take out a loan for $350,000 to try and keep the business open.

We hold that from the evidence presented, a reasonable jury could find that some loss occurred, and profits would have been realized during the period of construction had it not been for RBC's negligence. Accordingly, we reverse the decision granting the directed verdict and remand to the circuit court for a trial on the merits.

## B. Writ of Mandamus

Kelley's requests that our court issue a writ of mandamus directing the circuit court to "appropriately record all proceedings such that the record of those proceedings would be preserved for appeal." Arkansas Supreme Court Rule 1-2(a)(3) provides that petitions for writ of mandamus directed to the circuit court shall be filed with the Supreme Court; thus, we do not have jurisdiction to address this point on appeal.

## C. Acquired Immunity

RBC asserts that the circuit court's decision granting the directed-verdict motion should be affirmed by application of the acquired-immunity doctrine, even though the court did not find acquired immunity applied in this case. RBC contends that in addition to moving for a directed verdict on this basis, it "also filed a motion for summary judgment on the issue, which was denied in 2015, and by Amended Answer." RBC urges this court to affirm the circuit court's directed verdict under the "right result wrong reason" doctrine, which allows the appellate court to address an argument or rationale on which the circuit court never ruled. *See Cauffiel v. Progressive Eldercare Servs.-Saline, Inc.*, 2021 Ark. App. 314, at

9, 635 S.W.3d 1, 7. RBC contends that the instant case is an example of acquired immunity because the doctrine "provides that a contractor who performs work in accordance with the terms of a contract it has with a governmental agency and does so under the supervision of the governmental agency is not liable for damage resulting from that performance." We disagree. As we discussed above, whether RBC performed in accordance with the specifications of the contract is a question for the jury, and the issue of acquired immunity is not cognizable here.

Reversed and remanded.

ABRAMSON and TUCKER, JJ., agree.

*David A. Hodges*, for appellant.

*Barber Law Firm PLLC*, by: *Michael J. Emerson* and *Lauren A. Spencer*, for separate appellee Richard Baughn Construction, Inc.